# Richmond.

# Commonwealth of Virginia, ex. rel. The Page Milling Company, Inc., v. Shenandoah River Light and Power Corporation.

## January 18, 1923.

1. CORPORATION COMMISSION—*Jurisdiction of Commission to Fix Rates—Prior or Valid Contract as to Rates.*—In the instant case the relator, a milling company, denied the jurisdiction of the State Corporation Commission to regulate the rates to be charged it by defendant power company, upon the ground that these rates were prescribed and fixed by their contract entered into prior to the legislation vesting the Corporation Commission with power to regulate rates.

    *Held:* That this question had been determined in recent Virginia decisions in favor of the jurisdiction of the Commission with reference to franchise contracts between municipalities and public service corporations, and that this jurisdiction extended to contracts between public utilities and private consumers.

2. CORPORATION COMMISSION—*Jurisdiction of Commission to Fix Rates—Prior Valid Contract as to Rates—Identity of Corporations—Case at Bar.*—A milling company organized an electric company and its stockholders owned a controlling interest in the stock of that company. Subsequently the milling company sold its interest in the electric company to a power company and entered into a contract with the power company by which it was to be furnished power for a fixed time at a certain rate.

    *Held:* That, while this fact might be worthy of consideration by the Commission, if it should in the future undertake or be asked to accord a favorable classification and rate to the milling company, it does not deny or limit the jurisdiction of the Commission to fix the rates to be charged the milling company by the power company, because it was apparent that that was no copartnership nor identity between the milling company and the electric company, as they were organized for different purposes and were in every respect separate entities.

3. STATUTES—*Retroactive Construction—Acts of 1914 and Subsequent Enactments Vesting Corporation Commission with Power to Regulate Rates—Case at Bar.*—In the instant case it was claimed that the Acts of

1914 and subsequent enactments, which vested the Corporation Commission with the power to control, regulate, and prescribe the light and power rates of public service corporations, operate prospectively only, and that to apply a new schedule of rates to the service furnished a milling company by a power company, compensation for which was fixed under a valid prior contract, would be to give these acts a retroactive effect.

*Held:* That, while the general rule is that statutes operate prospectively, and not retroactively, it would be illogical to say that the fixing of the new rate by the Corporation Commission gives the statutes a retroactive effect, as it was not claimed that the rates for service performed before the statutes became effective could in any way be affected thereby. Clearly these statutes operate prospectively, and only upon such rates as are thereafter lawfully prescribed pursuant thereto.

4. IMPAIRMENT OF OBLIGATION OF CONTRACTS—*Police Power—Conflict between Contract and Police Power.*—The right of private contract must yield to the exigencies of the public welfare, when determined in an appropriate manner by the authority of the State. The interdiction of statutes impairing the obligation of contracts does not prevent the State from properly exercising such powers for the general good of the public, though contracts previously entered into between individuals may thereby be affected.

5. PUBLIC UTILITIES—*Jurisdiction of Corporation Commission to Fix Rates—Contract Subject to Sections 156-c, 159, and 164 of the Constitution of 1902.*—A contract between a power company and a consumer, under which the power company was to furnish power to the consumer for a certain time at a certain rate, was expressly subject to and subordinate to the provisions of the Constitution then effective (sections 156-c, 159, and 164), which expressly reserved the police power, provided that its exercise should never be abridged, and declared the right of the Commonwealth, through such instrumentalities as it might select, to define the duties of all public service corporations, to regulate and control them in the performance of their duties, and to fix and limit their charges.

6. PUBLIC UTILITIES—*Uniform Charges—Competing Companies—Section 4066 of the Code of 1919—Case at Bar.*—Under section 4066 of the Code of 1919 it is the duty of a public utility to furnish adequate service and to charge uniformly therefor all persons or corporations using such product under like conditions and not in competition with such furnishing company. In the instant case it was contended that the contract between the relator and the defendant was between competitive companies. The relator enjoyed no public service powers under its charter, and though it had organized and its stockholders had controlled an electric company, its interest in which it had sold

to the defendant, its relationship with the electric company was not such as to constitute a partnership.

*Held:* That the relator and defendant were not competitors within the exception of section 4066 of the Code of 1919.

7. PARTNERSHIP—*What Constitutes a Partnership—Agreement to Share Gross Receipts.*—An agreement to share gross receipts does not create a partnership.

8. PARTNERSHIP—*Common Law.*—Corporations at common law, and in the absence of charter authority, have no power to enter into a partnership.

9. PUBLIC UTILITIES—*Uniformity of Rates—Classification of Consumers— Furnishing Service Under Like Conditions—Section 4066 of the Code of 1919—Case at Bar.*—In the instant case it was claimed that the defendant did not furnish electric power to the relator under like conditions to those under which it supplied other users, and therefore the relator had a legal right to be placed in a separate class of customers, so as to enjoy the benefits of the existing rates, terms, and conditions of service provided for in a contract between the relator and the defendant, irrespective of a new schedule of charges established by the Corporation Commission.

*Held:* That while the power of the Commission to make a proper classification as between the several consumers of power furnished by the defendant could not be doubted, and it was probable that the relator was entitled to a favorable classification, yet that question was not raised in the present proceeding. The relator did not allege that the new rates were unreasonable, but denied the power of the Commission to inquire into their reasonableness and challenged the jurisdiction of the Commission absolutely.

10. PUBLIC UTILITIES—*Establishment of Rates by Corporation Commission— Existing Contract for Service—Impairment of Obligation of Contracts —Due Process of Law—Equal Protection of the Law.*—A new schedule of rates to be charged by a power company for power furnished, effective because not suspended by the Corporation Commission, which by operation of law became effective September 1, 1921, did not impair the obligation of a contract entered into between the power company and a consumer January 1, 1907, under which the consumer was entitled to service at a lower rate than that established by the new schedule, nor did it constitute a denial of equal protection of the law and the taking of property without due process of law, in violation of the consumer's constitutional rights.

11. POLICE POWER—*Impairment of Obligation of Contracts—Rates of Public Service Corporations—Police Power Enters into the Contract.*—The rule is that contracts upon subjects which are within the police power, even though valid when made, must be taken to have been

4

entered into in view of the continuing power of the State to control the rates to be charged by public service corporations. Every con-- tract made as to such rates with a corporation authorized to contract in reference thereto is made with the knowledge of and subject to the right of the State at any time to resume the exercise of such sovereign power. The legislative right to supersede it is as clear as though it were written into the contract itself, for the law implies it.

12. CONSTITUTIONAL LAW—*Eminent Domain—Taking of Property Without Just Compensation—Contract with Public Utility for Service—Increase of Rates—Case at Bar.*—A milling company organized and its stock-holders controlled an electric company, with which it had a contract for power free of charge. Subsequently, the milling company con-veyed its interest in the electric company to a power company, entering into a contract with the power company for power at a fixed rate for a fixed time. By permission of the Corporation Com-mission the power company increased the rates charged the milling company for service. It was claimed by the milling company that it transferred and relinquished its property as a consideration for the power to be furnished by the power company; and that the in-crease of the rates to be charged was in effect a taking of its property without compensation and without due process of law.

*Held:* That there was no merit in this contention, as the milling com-pany never had any legal interest in the electric company, nor did it have any title to any of the property of that corporation, which was. for a valuable consideration conveyed to the power company.

13. CORPORATION COMMISSION—*Jurisdiction to Fix Rates of Public Utilities —Method of Exercise of Power.*—The jurisdiction of the Corporation Commission to fix rates to be charged by public utilities, notwith-standing prior existing contracts between the utilities and con-sumers, can only be exercised for the reasons indicated in the statute and in the method prescribed thereby.

14. PUBLIC UTILITIES—*Corporation Commission—Increase of Contract Rate for Service by the Commission Without Investigation—Case at Bar.*—The relator had a contract with the defendant by which defendant was to furnish it with power at a certain rate for a fixed time. By a new schedule of rates defendant increased the rate charged relator, which became effective because not suspended by the Corporation Com-mission. In the instant case, without evidence or investigation, the commission adjudged the contract rate to be illegal and the new increased rate to be legal.

*Held:* Error, as a rate established by contract cannot be abrogated by the mere filing of a different rate, which the commission failed to suspend.

15. PUBLIC UTILITIES—*Contract Fixing Rates—Abrogation by the State.*—The State, in the exercise of its sovereign power, may abrogate contracts

between public utilities and consumers fixing rates for service, when the rates so contracted for are found to be unjust, unreasonable, insufficient or unjustly discriminatory, or to be preferential or otherwise in violation of any of the provisions of law. But such contracts are not lightly to be abrogated, and the limiting conditions precedent must be found to exist before this great sovereign power will be exercised. When fairly entered into between parties competent to contract, they are usually enforced.

16.  PUBLIC UTILITIES—*State Corporation Commission—Increase of Rates— Where Rates Have Been Fixed by Contract—Section 4071 of the Code of 1919—Acts 1918, page 674.*—Acts of 1918, page 674, providing that unless the State Corporation Commission suspends a new schedule of rates of a public utility the same shall go into effect, is inapplicable to rates presumptively legal, which have been previously established by existing contracts which were lawful when entered into. The statute which controls the Commission, when it is sought to change rates which have been lawfully established by contracts, is section 4071 of the Code of 1919, which provides for such change upon investigation by the Corporation Commission.

17.  PUBLIC UTILITIES—*Rates Fixed by Contract—Change of Rates—Investigation and Finding.*—A fair construction of Acts of 1918, page 674, and section 4071 of the Code of 1919, indicates that contract rates may not be changed by the State until and except there first be an investigation and a finding of the facts from which it can be adjudged that such rates must and should be modified, suspended, or abrogated for the reason stated in the statute, and in the public interest.

Appeal from an order of the Corporation Commission.

*Partly affirmed; partly reversed; remanded.*

The opinion states the case.

*George S. Harnsberger* and *Wm. V. Ford*, for the plaintiff in error.

*T. Justin Moore*, for the defendant in error.

PRENTIS, J., delivered the opinion of the court.

[1] The jurisdictional question raised in this case has been well argued and a number of questions closely re-

lated to each other have been discussed. We do not think it necessary to follow these elaborate arguments in detail, because, in our view, this question is no longer debatable in this State.

The question is raised by The Page Milling Company, Incorporated (hereinafter called the milling company), which denies the jurisdiction of the State Corporation Commission (hereinafter called the Commission), to regulate the rates to be charged the milling company by the power company, upon the ground that those rates are prescribed and fixed by their contract of January 1, 1907. This question has been so recently examined and passed upon by this court with reference to franchise contracts between municipalities and public service corporations that we deem it unnecessary to do more than to cite these cases and a few decisions from the Supreme Court of the United States and other jurisdictions, relating directly to such contracts between public utilities and private consumers of their products. *Virginia Western Power Co. v. Clifton Forge*, 125 Va. 469, 99 S. E. 729, 9 A. L. R. 1148; *City of Richmond v. Ches. & Potomac Telephone Co.*, 127 Va. 612, 105 S. E. 127; *Clifton Forge v. Virginia Western Power Co.*, 129 Va. 377, 106 S. E. 400; *Town of Victoria v. Victoria Ice, Light & Power Co., Inc.*, 134 Va. 134, 114 S. E. 92. In order, however, to appreciate the basis of the contention made for the milling company, it is necessary to make certain recitals of facts. The facts relied on are thus stated in the petition for appeal:

"That The Luray Electric Company, Incorporated, was chartered under the laws of Virginia in the year 1904, with the general powers of an electric company, the charter for which is filed with the petition in this cause. That, by virtue of a contract entered into on February 1, 1905, between The Page Milling Company

and The Luray Electric Company for a period of three years, The Page Milling Company was to furnish The Luray Electric Company whatever power it needed during that period, in return for which The Luray Electric Company was to furnish, free of charge, electric current for the lighting of the mill of The Page Milling Company, and also to give The Page Milling Company *a certain per cent. of the profits derived from the operation of its business*, and it was necessary that The Page Milling Company should consent before The Luray Electric Company had power to sell or to dispose of its plant, or any portion thereof. The Luray Electric Company had acquired easements in the streets of the town of Luray and all of the principal service contracts which were available in said town. Its business was a growing and paying one. That, prior to the incorporation of the Luray Electric Company, there existed in the town of Luray a company whose object and duty it was to furnish gas for lighting purposes. After the Luray Electric Company was incorporated and developed, it became necessary for the owners of the gas company either to go out of business entirely, because the electric service was so far superior to the gas service that every one was beginning to partonize The Luray Electric Company, or else develop an electric plant themselves. Facing this condition, the owners of the gas company incorporated what is known as The Shenandoah River Light and Power Corporation, the defendant in this cause, for the purpose of developing electricity from the water power which they had acquired on the Shenandoah river. So it can be seen, as is also pointed out in the evidence in this cause, that from the very beginning of the operation of The Luray Electric Company it was in competition with the incorporators and stockholders of the then gas company,

who afterwards incorporated the Shenandoah River Light and Power Corporation, and from the very inception of the incorporation and organization of the Shenandoah River Light and Power Corporation that company was in competition with the Luray Electric Company. That by virtue of the contract of 1906 between the Shenandoah River Light and Power Corporation and The Page Milling Company, the former obligated itself to furnish to the latter a certain amount of electric power at a stipulated price for a term of twenty years. The consideration for said power on the part of the Page Milling Company was in part the purchase price of its interest in certain property easements and franchises owned by The Luray Electric Company, in part its agreement to furnish the transformers and other electric equipment, as stated in said contract, in part the agreement of The Page Milling Company *not to use any other power* than that furnished by the Shenandoah River Light and Power Corporation, and in part $.00626561 per K. W. H. for the power to be furnished. * * * The power, as called for under the contract, was in the main, and so far as we are now concerned, furnished by the Shenandoah River Light and Power Corporation to The Page Milling Company, without question, until September 1, 1921, when new rates are claimed to have gone into effect."

The new rates, of which the milling company is complaining, were made effective merely because they were not suspended by the Commission, in accordance with the regulative statutes first enacted in 1914, now Code, sections 4066 to 4072, inclusive, as amended by the Acts of 1918, page 413.

[2] There is much emphasis placed upon the relations between the milling company and the Luray Electric Company, based upon the fact that the milling

company organized that company and its stockholders owned a controlling interest in the stock of the Luray company. While this fact may be worthy of consideration by the Commission if it shall in future undertake or be asked to accord a favorable classification and rate to the milling company, this circumstance does not deny or limit the jurisdiction of the Commission, or affect the proper determination of the jurisdictional question, because it is apparent that there was no copartnership nor identity between these two companies. Indeed there could not be, for they were organized for different purposes and were in every respect separate legal entities. The consideration paid by the appellee, the power company, to the Luray company for its assets constituted the full and complete consideration for that transfer. That there was a consideration for the contract between the milling company and the power company at the time it was entered into is also apparent, but this feature is common to all rate contracts between public service corporations and their patrons claiming thereunder.

Taking up the several contentions of the appellant, so far as it seems to be necessary, it is claimed:

[3, 4] 1. That the acts of 1914 and subsequent enactments, which vested the Commission with the power to control, regulate and prescribe the light and power rates of such public service corporations, operate prospectively only, and that to apply the new schedule of rates which became effective September 1, 1921, to the service furnished the milling company by the power company would be to give these acts a retroactive effect.

The Commission deals with this contention thus:

"Prior to the enactment of the utilities act, all rates of public utility companies were the result of agreement, express or implied, between those companies and

their customers, and if, therefore, all such rates were beyond the control of the Commission, the jurisdiction conferred by the act would have been practically *nil.* We cannot believe or hold that the legislature contemplated a result so futile and absurd.

"It is significant also that in the many cases, involving utility rates heard by the Commission, this contention does not appear to have been advanced by any of the able and astute counsel participating therein, nor does it appear to have occurred to the Supreme Court in arriving at its decision in *City of Richmond* v. *C. & P. Tel. Co.,* 127 Va. 612, 105 S. E. 127. In that case, while holding that the franchise contract between the telephone company and the city was not binding upon the State, it was nevertheless recognized, in conformity with an unbroken line of authority, that the franchise was a contract binding upon the parties thereto unless and until the police power of the State was invoked to prevent the operation of its rate provisions. The jurisdiction of the Commission under sections 4052 and 4054 of the Code of 1919, over the rates, established by franchise contract prior to the passage of the legislation referred to, was sustained notwithstanding the valid contract *inter partes* although the point now in issue was not discussed."

Of course there can be no doubt about the general rule that statutes operate prospectively and not retroactively; but it is illogical to say that the construction which the Commission has given to these statutes gives them a retroactive effect, for it is not claimed that the rates charged or collected for service performed before they became effective can in any way be affected thereby. Clearly these statutes operate prospectively, and only upon such rates as are thereafter lawfully prescribed pursuant thereto.

There are two recent decisions of the Supreme Court of the United States which conclusively deny this contention.    There is certainly a suggestion of finality in this language of Mr. Justice Clarke, in *Union Dry Goods Co.* v. *Georgia Public Service Corporation,* 248 U. S. 372, 63 L. Ed. 309, 39 Sup. Ct. 117, 9 A. L. R. 1420, where this identical question was raised.    He says:

"Except for the seriousness with which this claim has been asserted and is now pursued into this court, the law with respect to it would be regarded as so settled as not to merit further discussion.

"That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court.    Thus, in *Manigault* v. *Springs,* 199 U. S. 473, 480, 50 L. Ed. 274, 278, 26 Sup. Ct. Rep. 127, it was declared that:

" 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from (properly) exercising such powers   *   *   for the general good of the public, though contracts previously entered into between individuals may thereby be affected.' "    After citing a number of cases, he concludes the opinion with this language:

"These decisions, a few from many to like effect, should suffice to satisfy the most skeptical or belated investigator that the right of private contract must yield to the exigencies of the public welfare when determined in an appropriate manner by the authority of the State."

The same question was raised in *Producers' Transportation Co.* v. *Railroad Commission of California,* 251 U. S. 228, 40 Sup. Ct. 131, 64 L. Ed. 239.    This was a case arising under a California statute, which declared pipe lines used for the transportation of crude oil,

directly or indirectly, to or for the public for hire, should be deemed common carriers and subject to the jurisdiction of the railroad commission.   Mr. Justice Van Devanter concludes his opinion with this: "That some of the contracts before mentioned were entered into before the statute was adopted or the order made is not material.   A common carrier cannot, by making contracts for future transportation, or by mortgaging its property or pledging its income, prevent or postpone the exertion by the State of the power to regulate the carrier's rates and practices.   Nor does the contract clause of the Constitution interpose any obstacle to the exertion of that power.   *Chicago, B. & Q. R. Co.* v. *Iowa* (*Chicago B. & Q. R. Co.* v. *Cutts*), 94 U. S. 155, 162, 24 L. Ed. 94, 95; *Louisville & N. R. Co.* v. *Mottley*, 219 U. S. 467, 482, 55 L. Ed. 297, 303, 34 L. R. A. (N. S.) 671, 31 Sup. Ct. Rep. 265; *Union Dry Goods Co.* v. *Georgia Pub. Service Corp.*, 248 U. S. 372, 63 L. Ed. 309, 9 A. L. R. 1420, P. U. R. 1919C, 60, 39 Sup. Ct. Rep. 117."

[5] In this State, a further answer to this contention is, that this contract is expressly subject to and subordinate to the provisions of the Constitution then effective (sections 156-c, 159 and 164), which expressly reserved the police power, provided that its exercise should never be abridged, and declared the right of the Commonwealth, through such instrumentalities as it might select, to define the duties of all public service corporations, to regulate and control them in the performance of their duties and to fix and limit their charges.

[6-8] 2. It is claimed that the milling company is within one of the exceptions of Code, section 4066, and that this contract was between competitive companies engaged in a similar business.

The Commission sufficiently answers this contention in its opinion:

"The milling company enjoyed no public service powers under its charter nor do we think that the contract between it and The Luray Electric Company was of such character and effect and the operations of the milling company thereunder of such nature as to justify us in holding that the milling company was engaged in the manufacture and distribution of light and power.

"By the contract in question the milling company merely obligated itself to furnish to the electric company the necessary power for the production of electricity which so far as the record shows was sold and distributed by the electric company.

"It is true that the milling company received for its service a portion of the gross receipts of the electric company, and it might, perhaps, be argued that such an arrangement constituted a partnership which in turn would justify the conclusion that the milling company was also engaged in public service.    But an agreement to share gross receipts does not create a partnership.    Mechem's Elements of Partnership, section 53.    Moreover, corporations at common law, and in the absence of charter authority, have no power to enter into partnership (*News-Reg. Co. v. Rockingham Pub. Co.*, 118 Va. 140, 86 S. E. 874), and so far as the record shows, neither of the corporations in question had such charter power.    Partnership, so far as the parties thereto are concerned, is the result of agreement effectuating the intent of the parties to consummate such relationship and we can indulge no presumption that these corporations intended to enter into an *ultra vires* contract when the relationship assumed is perfectly compatible with an intent to engage in a business transaction within the corporate powers of the corporations concerned.

"We see no reasonable ground for holding that the milling company is within the exception of section 4066."

[9] 3. It is claimed that the power company does not furnish electric power to the milling company under like conditions to those under which it supplies other users therewith, and, therefore, the milling company has a legal right to be placed in a separate class of customers, so as to enjoy all of the benefits of the existing rates, terms and conditions of service provided in the power contract, irrespective of the new schedule of rates and charges approved September 1, 1921.

That the Commission has the power to make a proper classification as between the several consumers of power furnished by the power company cannot be doubted, and it seems probable that the milling company is entitled to a favorable classification; but that question was not raised in the proceeding before the Commission. The milling company did not, in its petition, allege that the rates which were filed September 1, 1921, were unreasonable, but denied the power of the Commission to inquire into their reasonableness, offered no proof relating thereto, and challenged the jurisdiction of the Commission absolutely and without reference to whether these contract rates were reasonable or unreasonable. The Commission, however, in the order appealed from, undertook to preserve this right to the milling company by this language: "But nothing in this order shall be deemed to prejudice the right of Page Milling Company to hereafter apply to the Commission for a revision of the rate schedules of the Shenandoah River Light and Power Corporation, heretofore filed and effective September 1, 1921." If this issue is hereafter raised, the Commission must give fair consideration thereto and accord the milling company the classification and rate to which it is entitled.

[10] 4. The fourth and fifth contentions are, that the new schedule of rates of the power company, which by operation of law became effective September 1, 1921, impairs the obligation of the contract of January 1, 1907, and that it constitutes a denial of equal protection of the law and the taking of property without due process of law, in violation of its constitutional rights.

What we have said in the Virginia cases hereinbefore cited is, we think, a sufficient denial of these contentions, and the conclusions there stated are fully sustained by recent opinions of the Supreme Court of the United States hereinbefore cited, as well as by *Louisville & Nashville R. Co.* v. *Mottley;* 219 U. S. 467, 31 Sup. Ct. 265, 35 L. Ed. 297, 34 L. R. A. (N. S.) 671, and *Chicago & Alton R. Co.* v. *Tranbarger,* 238 U. S. 67, 35 Sup. Ct. 678, 59 L. Ed. 1204, and *Ortega Co.* v. *Triay, Receiver Jacksonville Traction Co.,* Sup. Ct. U. S., Nov. 13, 1922, 43 Sup. Ct. 44, 67 L. Ed.    Among other recent cases which support these conclusions is *Raymond Lumber Co.* v. *Raymond Light & Water Co.,* 92 Wash. 330, 159 Pac. 133, L. R. A. 1917C, 574, P. U. R. 1916F, 437. In that case the water company, with the view of inducing the location of a sawmill in the village of Raymond, Washington, agreed to furnish water necessary for the use and operation of the sawmill for a period of forty years at the rate of $5.00 per month for each and every steam boiler contained in the mill.    For about seven years the water company continued to furnish water in accordance with this contract, but then a complaint was filed before the Public Service Commission by citizens of the city of Raymond against the water company, claiming that the rates of the company were unreasonable and excessive, and alleging that the water supply was inadequate and insufficient.    The rates which were charged under the contract were less than

the rates charged to other water users, with one or two exceptions in favor of other sawmills. The Commission found that the rates charged to these mills were discriminatory and ordered the water company to cancel the contracts with the mills, including that with the Raymond Lumber Company and thereafter the water company notified the lumber company that it would be required to pay for all water furnished by it in accordance with the published rates and tariffs, as approved by the Commission. The lumber company then brought suit to restrain the water company from denying the plaintiff the right to receive water in accordance with the rate fixed in the original contract of 1905, and to recover certain payments for water in excess of the contract rate, which payments had been made under protest prior to the institution of the suit. While the lower court granted the relief sought, on appeal to the Supreme Court of Washington, the judgment was reversed, the court taking the view that regardless of the pre-existing contract the lumber company was bound to pay the rate prescribed by the Commission, saying this:

"The principal question in the case is whether the Public Service Commission had power to direct the water company to cease to furnish water under the contract, and charge for the same at its published tariff rate.

"By the Public Service Commission law (Laws 1911, chap. 117, p. 54; Rev. Code 1915, sec. 7493-1), the Public Service Commission therein created is given jurisdiction to determine the rate that shall be charged and the service that shall be rendered by public service corporations, including water companies. *This act was passed subsequent to the time when the water contract under which The Raymond Lumber Company is claiming was executed. Hence, at the time the contract was entered into, the parties thereto had a right to contract with reference to the rate.*

"* * * it will be assumed, but not decided, that there was a consideration for the water contract at the time it was entered into, and that the contract at the time was a valid obligation between the parties.

"The question, then, arises, if the contract was valid at the time it was entered into, can it be terminated under the provisions of the Public Service Commission law subsequently passed? As already stated, the water company was a public service corporation, and jurisdiction over its rates and service was conferred by the public service law upon the Public Service Commission. The power to regulate and control the rates of public service corporations is within the legitimate exercise of the police power of the State. This power may be exercised by the legislature itself by enacting a law fixing rates, or the legislature may delegate the power to fix rates to a properly constituted commission, subject to judicial review. State ex rel. Webster v. Superior Ct., 67 Wash. 37, L. R. A. 1915-C, 287, 120 Pac. 861, Ann. Cas. 1913-D, 78. In this State the legislature has conferred the rate-making power upon the Public Service Commission by the Public Service Commission law.

[11] "It is contended that, even though the State, under its police power, may fix the rates to be charged by public service corporations, that, notwithstanding this fact, a contract, valid when entered into, is not subject to be abrogated under the provision of a law subsequently enacted. This contention cannot be sustained. The rule is that contracts upon subjects which are within the police power, even though valid when made, must be taken to have been entered into in view of the continuing power of the State to control rates to be charged by public service corporations. * *

"In the Louisville & N. R. Co. Case, 219 U. S. 467, 65 L. Ed. 297, 34 L. R. A. (N. S.) 671, 31 Sup. Ct. 265,

quoting Judge Cooley with approval, it was said: 'If the legislature had no power to alter its police laws when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose.' No doctrine to that effect would be even plausible, much less sound and tenable."

So also in the recent case of *Minneapolis, etc., R. Co. v. Menasha Woodenware Co.*, 159 Wis. 130, 150 N. W. 411, L. R. A. 1915-F, 732, which, however, was a freight rate case, in which freight rates had been fixed by a contract as one of the inducements which led a milling company to construct its mill at a certain point on the line. The public utilities act of Wisconsin was not enacted until 1905, which was several years subsequent to the contract for freight rates. In the course of that opinion, the well established rule is thus epitomized: "Every contract made as to such rates with a corporation authorized to contract in reference thereto is made with the knowledge of and subject to the right of the State at any time to resume the exercise of such sovereign power. The legislative right to supersede it is as clear as though it were written into the contract itself, for the law implies it."

The same rule is enforced in *Ohio & Colorado Smelting & R. Co. v. Public Utilities Commission*, 68 Colo. 137, 187 Pac. 1082.

[12] The learned counsel for the milling company concedes the principle, but undertakes to distinguish this case from the line of cases to which we have referred by claiming that the milling company in this case has furnished a consideration by conveying, transferring and relinquishing its property as a consideration for power, and hence that the effect of the holding that the performance of that agreement is made unlawful by

the legislation referred to is to take its property from the milling company without compensation and without due process of law; and relies upon the case of *Schiller Piano Co. v. Illinois Northern Utilities Co.*, 288 Ill. 580, 123 N. E. 631, 11 A. L. R. 454. This case may be out of line with the great weight of authority, but it is certainly clearly distinguishable from the case in judgment. There the piano company was and had for twenty years engaged in the manufacture of pianos at the west end of a dam located across Rock river, in the State of Illinois. This dam had been constructed for the purpose of furnishing power for carrying on various manufacturing enterprises. It was capable of creating power estimated to equal 1,000 horse power. In 1910 the piano company owned 117 horse power created by the dam, and in that year entered into a contract with the Oregon Power Company whereby it sold and transferred to it 117 horse power created by the dam in consideration of an agreement then made by the power company to furnish to the piano company perpetually thereafter at its factory ninety kilowatts of electric power free of charge, with the obligation to pay for all power furnished in excess of said ninety kilowatts. This contract was performed until May, 1912, when a new contract was entered into whereby it was agreed that seventy-two and four-tenths kilowatts of electric power, free of charge, should be furnished, instead of ninety kilowatts. Shortly after this revision of the contract, the power company sold and transferred all of its rights in the dam to the Illinois Northern Utilities Company, which assumed the obligations of the power company and furnished power to the piano company until October, 1913, when it notified the piano company in writing that, on account of the dam having been taken out by high water, it would

5

discontinue furnishing power after the following November. The piano company instituted its suit, praying that the utilities company be enjoined from discontinuing the power under said contract, and that the said contract be enforced. The utilities company answered the bill, denying that the piano company was entitled to the relief prayed for, and by cross-bill alleged that in the year 1914 the public utilities act of the State went into effect, that the utilities company was a public utility, doing business subject to said act, that the act provided that its rates and charges must be reasonable and just, and that it was prohibited from charging or receiving a different rate from that provided in the published and approved schedule of rates, and, therefore, that it had become unlawful for the utilities company to furnish power to the piano company free of charge.

In that case the principle which applies to this case was distinctly recognized, for in upholding the right of the piano company the court concedes that if the piano company had owned no interest in the dam itself before the passage of the utilities act, and had entered into a contract with the power company to furnish power at a certain rate or charge per annum, and the rate fixed was lower than the authorized schedule, the performance of the contract would have been unlawful after the act went into effect. Whether the conclusion in that case is sound or not, the facts of this case are so different as clearly to distinguish it. The Page Milling Company, a private corporation, as such, never had any legal interest in The Luray Electric Company, nor did it have any legal title or right to any of the property of that corporation, which was for a valuable consideration paid to it, conveyed by the Luray company to the power company. The only basis here for the claim

is that the milling company and the Luray company had the same stockholders, who owned a controlling interest in both, and at the time the contract of January 1, 1907, was made with the power company its contract with the Luray company had one year longer to run.    Its rights under this contract are all that it then surrendered, and it cannot be held to have sold or conveyed any of the property of the Luray company for the very obvious reason that it did not own any of it. The annotator of this case in 11 A. L. R. is of opinion that it is in conflict with the majority of cases cited in the note.

The case of *Village of Long Beach* v. *Long Beach Power Co.,* 104 Misc. Rep. 337, 171 N. Y. Supp. 824, which is also relied on for the appellee, like that last cited, also presents a different question from that here involved, and may likewise be easily distinguished from this case.

A recent decision of the Utah Commission *In re Utah Power & Light Co.,* P. U. R. 1922-A, 436, is worthy of attention in similar cases.    The contract there considered, however, bears slight resemblance to that here involved.    There the controversy was between a hotel company which owned a heat, light and power plant for its own use, but which it was also operating as a public utility.    It sold this plant to a power company for its "full cost cash market value," separate from the contract for service at favorable rates.    The commission held that the pre-existing contract had been superseded by the public utility act and by its order pursuant thereto, maintained its jurisdiction over the rates thus contracted for, and increased them.    In prescribing the increased rates, however, the hotel company was credited with what was estimated to be the "going value" of its plant, which amounted to a sum equal to about

eight per cent. of the amount claimed as excess consideration, amortized, however, over the entire period of the contract, with interest at six per cent. upon the deferred payments.

[13] So, here, if the milling company has parted with any property which constitutes any substantial consideration to the power company, this consideration may be taken into account when and if the Commission is asked to give it a more favorable classification and lower rates than those which are now proposed. So much of the order of the Commission as asserts its jurisdiction over the rates is plainly right. This jurisdiction, however, so potential for good or ill, can only be exercised for the reasons indicated in the statute and in the method prescribed thereby.

[14] In this case, without evidence or investigation, the Commission adjudged the contract rate to be illegal and the new increased rate to be legal. The only basis for this adjudication which is shown by the record is the holding that in the absence of allegation or evidence of unreasonableness, the new rate not having been suspended by the Commission became effective by operation of the statute. This portion of the order directs our attention sharply to a question which has not been before discussed by this court—that is, whether a rate established by contract can be abrogated by the mere filing of a different rate which the Commission fails to suspend.

In *City of Richmond* v. *Chesapeake & Potomac Telephone Co.*, *supra*, the existing status was preserved, and the rates which had been prescribed while the company was under Federal control were continued, but whether these were reasonable and proper rates to be charged was expressly reserved by the Commission for investigation. In *Town of Victoria* v. *Victoria Ice, Light &*

*Power Co., Inc.*, *supra*, the Commission suspended the proposed increased rates pending an investigation, and thereafter condemned the contract and prescribed the rates which it adjudged reasonable.    The precise question  thus presented has been recently considered and determined by the Supreme Court of the United States in *Wichita Railroad & Light Co.* v. *Public Utilities Commission of Kansas, etc.*, (U. S.) 43 Sup. Ct. 51, 67 L. Ed. —, decided November 13, 1922.    There the Wichita company, which was the consumer, had, in 1910, entered into a contract with the Kansas Gas and Electric Company for electric power at specified rates, until 1930, which contract was performed until 1918.    Then the Gas and Electric Company filed its petition with the Kansas Commission, in which it prayed for the abrogation of this contract and for new and increased rates.    This prayer was granted, and the rates prescribed by the Commission were substantially higher than those specified in the contract.    Thereafter, in accordance with the usual procedure in that State (instead of taking the case to the appellate court by appeal, as is required in this State), the Wichita company filed its bill in equity in the United States District Court to enjoin the Commission from enforcing the increased rates.    The Commission, as well as The Gas and Electric Company (which was allowed to intervene), answered the bill, denying that the order for the increased rates was discriminatory or unjust, and averring that the contract of 1910 had been legitimately abrogated in the exercise of the police and legislative power of the State.    No evidence was certified and no facts were found by the Commission.    The Wichita company asked the court for judgment on these pleadings, upon the ground that the order of the Commission was void on its face.    The district court sustained this motion and enjoined the Gas

and Electric Company and the Commission from making the increased rates effective.    The Circuit Court of Appeals, however, reversed this decree, Sanborn, J., dissenting.    *Public Utilities Commission, etc.* v. *Wichita R. & Light Co.* (C. C. A.), 268 Fed. 37.    From this decree of reversal the Wichita company appealed to the Supreme Court of the United States which reversed the decree of the Circuit Court of Appeals, and affirmed the decree of the district court, which gave judgment on the pleadings in favor of the Wichita company, the consumer.

[15] It is seen then that the four Federal judges who heard the case before the final appeal, were equally divided in opinion, but the pronouncement of the Supreme Court of the United States must be considered decisive. There are slight differences between the Kansas statutes which were under review in that case and the Virginia statutes, but the underlying principle upon which it was decided can be universally applied.    This underlying principle can be thus stated: The State in the exercise of its sovereign power may abrogate such contracts in the public interest when, using the language of the Vir-Virginia statute (Code, section 4071), the rates so contracted for are "found to be unjust, unreasonable, nsufficient, or unjustly discriminatory, or to be preferential or otherwise in violation of any of the provisions of law."    The language of the statute, however, clearly indicates the limiting conditions precedent which must be found to exist before this great sovereign power will be exercised.    Notwithstanding the existence of this power of the State, which cannot now be fairly doubted, such contracts are not lightly to be abrogated.    When fairly entered into between parties competent to contract they are usually enforced.

In deciding that the rates prescribed in excess of the

rates contracted for, were invalid in the recent Kansas case, upon the ground that the record failed to show that the Kansas Commission had either investigated the rates involved or, after hearing, expressly found the contract rates to be unjustly discriminatory or unduly preferential, the court, speaking by Mr. Chief Justice Taft, stated that their conclusion accorded with the construction put upon similar statutes in other States, and then proceeded thus: "Moreover, it accords with general principles of constitutional government. The maxim that a legislature may not delegate legislative power has some qualifications, as in the creation of municipalities, and also in the creation of administrative boards to apply to the myriad details of rate schedules, the regulatory police power of the State. The latter qualification is made necessary in order that the legislative power may be effectively exercised. In creating such an administrative agency the legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function. It is a wholesome and necessary principle that such an agency must pursue the procedure and rules enjoined and show a substantial compliance therewith to give validity to its action. When, therefore, such an administrative agency is required as a condition precedent to an order, to make a finding of facts, the validity of the order must rest upon the needed finding. If it is lacking, the order is ineffective."

[16, 17] The statute in Virginia (Acts 1918, page 674), provides for increases in the rates of public utilities companies, after schedules showing such changes have been duly filed with the Commission, with notice to the public, and for the suspension of such proposed rates until the Commission can investigate and deter-

mine whether the new rates should become effective
and then contains this provision: "Unless the Commis-
sion so suspends said schedule of rates, tolls, charges,
rules and regulations, or changes thereof, the same shall
go into effect as originally filed by the public utility,
upon the date specified in the schedule, subject, how-
ever, to the power of the Commission, upon investiga-
tion thereafter, to fix and order substituted therefor
such rate or rates, tolls, charges, rules, or regulations as
shall be just and reasonable," as provided in section 7 of
the act of 1914, new Code, section 4071.

We think that the Commission, in this case, has mis-
construed the effect of the clause just quoted.    That
provision is inapplicable to rates presumptively legal,
which have been previously established by existing con-
tracts which were lawful when entered into.    The stat-
ute which controls the Commission, when either the
Commission or a public utility essays to change rates
which have been theretofore lawfully established by
contracts, is Code, section 4071, which reads thus:

"If upon investigation the rates, tolls, charges, sched-
ules, or joint rates of any public utility operating in this
State shall be found to be unjust, unreasonable, insuffi-
cient or unjustly discriminatory, or to be preferential or
otherwise n violation of any of the provisions of law,
the State Corporation Commission shall have power to
fix and order substituted therefor such rate or rates,
tolls, charges, or schedules as shall be just and reason-
able."

There is a presumption that such contracts will be
performed, and they are obligatory upon the parties
thereto until and except the State shall exercise its sov-
ereign power to modify, suspend, or abrogate them in
the public interest.    Until this power is exercised, for
the reasons and in the method prescribed, such con-

tracts remain effective.    In cases like this, when it is shown that there is an outstanding contract by which the rate involved was established, then the Commission should suspend the proposed rate which contravenes such a contract for such reasonable time as is requisite for the submission of the evidence and the completion of the necessary investigations and hearings provided for by the statutes cited and otherwise.    To hold otherwise would enable one of the parties bound by a contract to evade its obligations without cause assigned or shown and thus to accord to such action the sanction which can only be accorded to action by the State after cause has been shown.    A fair construction of the statutes referred to indicates that contract rates may not be changed by the State until and except there first be an investigation and a finding of the facts from which it can be adjudged that such rates must and should be modified, suspended, or abrogated for the reasons stated in the statute, and in the public interest.    If there has been reason for a fair difference of opinion about this, the pronouncement of the Supreme Court of the United States is conclusive.

Our conclusion in this case, then, is that the Commission should have suspended the proposed rate involved until, upon the prayer of the power company, or upon its own initiative, it had made the necessary investigation and found the facts, if they existed, which justified the abrogation of such contract.    So much of the order appealed from as holds that the increased rates became valid and effective September 21, 1921, is reversed, and the case is remanded to the Commission for the determination of such further issues, if any, as may arise.

*Partly affirmed; partly reversed; remanded.*