E. P. HINKEL & COMPANY, INC.

v.

The MANHATTAN COMPANY,
Appellant.

No. 72–1553.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 2, 1973.

Decided Oct. 25, 1974.

John F. Mahoney, Jr., Washington, D. C., with whom Charles E. Pledger, Jr., Washington, D. C., was on the brief, for appellant.

James A. Treanor, III, Washington, D. C., with whom Bernard J. Long, Jr., Washington, D. C., was on the brief, for appellee.

Before TAMM, ROBINSON and WILKEY, Circuit Judges.

TAMM, Circuit Judge:

Appellee E. P. Hinkel & Co. (Hinkel) brought this action seeking damages and an injunction, alleging that appellant The Manhattan Co. (Manhattan) had breached the provisions of a lease by failing to pay rent and by operating a carpet sales business in violation of a covenant not to compete. Manhattan answered that any breach on its part was excused by Hinkel's conduct, and counterclaimed for damages. After discovery, Hinkel moved for summary judgment. District Court Judge June L. Green granted Hinkel's motion, awarded injunctive relief, and postponed the question of damages for a later hearing.[1] Judge Green also stayed the injunction pending this appeal by Manhattan which challenges the award of summary judgment and injunctive relief. Although our reasoning differs from that of the learned trial judge, we conclude that Judge Green properly granted Hinkel's motion for summary judgment. We also conclude that Manhattan's challenge to the injunction is now moot.

The facts leading to this dispute are not in conflict. Until 1959, E. P. Hinkel & Co. operated both a rug cleaning, storage, and repair business, and a carpet sales and installation business in the District of Columbia. With the death of E. P. Hinkel, Jr., the Hinkel family decided to lease the rug cleaning business since they could not operate both businesses successfully. J.A. at 28–29. Negotiations between Hinkel and Manhattan began in fall, 1958, culminating in an agreement, signed February 4, 1959, whereby Hinkel leased its rug cleaning business, machinery, equipment, trucks, and the majority of its building to Manhattan for ten years at an annual rental of $50,000 with two five year options to renew.[2] The interpretation of the 1959 lease is paramount to this litigation.

In 1967, Hinkel leased its carpet sales business to Manhattan through 1974 at an annual rental of $12,000 with a five year option to renew. In return, Manhattan agreed to extend the original lease of the rug cleaning business through 1974. Manhattan also received an option to purchase both businesses for $130,000 in 1974 or 1979. These additions were reflected as amendments to the 1959 lease which otherwise remained "in full force and effect. . . ."[3] J. A. at 61.

During October, 1959, the carpet cleaning machinery became inoperative due to ordinary wear and tear. J.A. at 16. Mr. Paul Hinkel was informed of the problem and suggested that Manhattan obtain an estimate of the cost of replacement. J.A. at 68. In May, 1970, Manhattan presented an estimate of $210,000 accompanied by a written demand that Hinkel & Co. replace all worn-out machinery. J.A. at 62–63. The company declined. On December 31, 1970, Manhattan abandoned the premises and refused to pay further rental installments. Virtually simultaneously, on January 1, 1971, Manhattan announced that it would begin operating a carpet cleaning and sales business under its own name.

Throughout this litigation Hinkel has maintained that Manhattan breached the 1959 lease by refusing to make rental payments and by operating a carpet sales business in contravention of a covenant not to compete. On appeal, Manhattan contends that Judge Green erred in granting summary judgment and enjoining it from operating a carpet sales business. It argues now as it did in the trial court that Hinkel had either a contractual duty to replace the machinery

1. Mem. Order, Civ.No. 3032–70 (D.D.C. May 5, 1972), Joint Appendix at 73. (hereinafter J.A.).

2. The text of the 1959 lease appears at J.A. 32–49.

3. The text of the 1967 lease appears at J.A. 55–61.

or that Hinkel assumed this duty as a matter of law. Hinkel denies the existence of any such legal or contractual duty.

■ Counsel for Manhattan has informed us that Manhattan is no longer engaged in the carpet sales business prohibited by the covenant not to compete. Consequently, Manhattan's challenge to the injunction is moot. Although this court's jurisdiction is predicated upon 28 U.S.C. § 1292(a)(1), which provides for the interlocutory appeal of orders granting, denying, modifying, or dissolving injunctions, we nevertheless retain jurisdiction to decide the issues concerning summary judgment. An appeal from an order made appealable by 28 U.S.C. § 1292 carries with it the power to review the merits of the case. Smith v. Vulcan Iron Works, 165 U.S. 518, 525, 17 S.Ct. 407, 41 L.Ed. 810 (1897); Johnson v. England, 356 F.2d 44, 46 n. 1 (9th Cir. 1966). A resolution of the propriety of awarding summary judgment is still important to both parties as Hinkel's claim for substantial damages awaits determination in the trial court. As Justice, then Circuit Judge, Blackmun said in the strikingly similar case of Hedberg v. State Farm Mutual Automobile Insurance Co., 350 F.2d 924, 933 (8th Cir. 1965), "[i]t would be a waste of time and seemingly futile to dismiss this appeal as moot now only to have the very same issues brought to us once again after damages have been determined."

■ In reviewing a motion for summary judgment, we must determine whether there are genuine issues of material fact, and if not, whether the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); Dewey v. Clark, 86 U.S.App.D.C. 137, 180 F.2d 766, 770 (1950). In reviewing the grant of this motion we are not bound by the findings of the trial judge, but must undertake an independent review of the record. See National Life Insurance Co. v. Silverman, 147 U.S. App.D.C. 56, 454 F.2d 899, 908–914 (1971). Having carefully reviewed the record from the trial court, including the complaint and answer, the interrogatories, the affidavits, the parties' statements as to genuine issues, and the contract itself, we are convinced that there is no genuine issue of material fact and that Hinkel is entitled to judgment as a matter of law.

■ Manhattan asserts that the proper interpretation of the 1959 lease raises genuine issues of fact. It argues that a jury trial is necessary to determine whether Hinkel is contractually obligated to replace the worn-out machinery. However, jury trials are only required where the contract is ambiguous. This jurisdiction follows the general rule that the court interprets unambiguous contractual provisions. In so doing, the court does not consider extrinsic evidence, but finds the intention of the parties in the language used to express their agreement. See Vogel v. Tenneco Oil Co., 150 U.S.App.D.C. 383, 465 F.2d 563 (1972); Henson Creek Development Co. v. Richards, 296 F.Supp. 915 (D.D.C.1969); Burbridge v. Howard University, 305 A.2d 245 (D.C.App.1973); Minmar Builders, Inc. v. Beltway Excavators, Inc., 246 A.2d 784 (D.C.App. 1968); Gagnon v. Wright, 200 A.2d 196 (D.C.App.1964). We have thoroughly examined the contract and find it to be clear and unambiguous. Hence, no jury resolution of the meaning of any contractual term is necessary. We find further that the contract does not explicitly or implicitly obligate Hinkel to replace the worn-out machinery.

The contract before us is a detailed one, defining in separate articles the rights and obligations of the parties with respect to the interior and exterior of the building, Hinkel's rug cleaning business, and the machinery and equipment used in that business. The most significant contractual provision states that:

Manhattan will maintain at its expense, [Hinkel's] machinery, equipment, and trucks in proper operating condition. Upon termination of this

lease, or any renewal thereof, Manhattan will return the leased machinery and equipment to Hinkel in such condition as when received, ordinary wear and tear and damage by fire, Act of God, or public enemy excepted; . . .

. . . With regard to replacement of Hinkel's above machinery and equipment, Manhattan may replace the same during the term of this lease, and all renewals thereof.
. . .

J.A. at 40.

Other important provisions of the lease manifest the care the parties exercised in fashioning this agreement. Manhattan is required to compensate Hinkel if Manhattan replaces machinery that still has value. J.A. at 40. In determining rental payments for the renewal periods, any increase in rent is to be reduced by five percent of the cost of the original machinery no longer in service. J.A. at 44. Manhattan, rather than Hinkel, is to maintain the buildings, equipment, and machinery to District of Columbia Code standards. J.A. at 42.

We think that the plain meaning of the parties' agreement respecting repair and replacement is that Manhattan was required to keep the machinery in good repair, but was not responsible for ordinary depreciation. Manhattan also could replace the existing rug cleaning machinery but was not obligated to do so. Most importantly, nothing in the lease explicitly or implicitly places the burden of replacement on Hinkel. In fact, the most likely inference is that the parties anticipated that Manhattan would, if it so desired, replace the machinery since: 1) Manhattan had exclusive control of the machines and was required to make repairs including those necessary to conform to health and safety codes; 2) Manhattan was to receive credit against future rental increases for equipment and machinery that it replaced; and 3) in 1967, just two years before the equipment wore out, Hinkel gave Manhattan the option to purchase the rug cleaning and carpet sales businesses for $130,000, a nominal purchase price for two businesses that commanded a combined annual rental of $62,000.

Manhattan argues that this interpretation of the agreement could not be the parties' intention because "[g]ood business judgment would . . . preclude Manhattan from incurring replacement costs in excess of $200,000." Appellant's Br. at 6. However, this unsupported statement is not clear evidence that both parties intended to give a different meaning to clear and unambiguous contractual provisions. Henson Creek Development Co. v. Richards, *supra,* 296 F.Supp. at 917–919; *see* Vogel v. Tenneco Oil Co., *supra,* 465 F.2d at 565–566. Moreover, Manhattan has never suggested that the 1959 lease does not embody the entire agreement of the parties, despite numerous opportunities to do so. One of the purposes of summary judgment is to determine whether the parties can provide evidentiary support for their version of the facts. Perma Research and Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969). If a party has credible evidence for its position, it must make the existence of such evidence known. "[S]ummary judgment cannot be defeated by the vague hope that something may turn up at trial." *Id., citing* Radio City Music Hall Corp. v. United States, 135 F.2d 715 (2d Cir. 1943). The mere fact that in retrospect an agreement does not seem favorable does not give the aggrieved party, a jury, or this court the right to reinterpret clear and unambiguous contractual language.

Manhattan argues alternatively that in the absence of an agreement Hinkel was under a legal duty to replace the machinery. In the district court, Manhattan maintained that the machinery was personal property and that the bailor implicitly warrants the fitness of his chattel to the bailee. Hinkel argued principally that the machines were fixtures and that the common law of land-

lord and tenant negated any implied duties. However, under either characterization, Manhattan's assertion of an implied legal duty is without merit.

■ Traditionally, under common law, the lessor of real property is not obligated to make repairs to the property in the absence of an agreement or a statute to the contrary. In contrast, the tenant has a duty to make minor repairs. 1 American Law of Property § 3.78 (A. J. Casner ed. 1952). As appellant correctly notes, recent cases have questioned the practicality of this rule in an urban environment and have imposed a duty to repair on the landlord by way of implied warranty. Javins v. First National Realty Corp., 138 U.S. App.D.C. 369, 428 F.2d 1071, 1076–1077 cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970). However, this trend has been restricted to lessors of residential property that does not meet housing code standards. Restatement (Second) of Property §§ 5.4 comment c, 5.5. (Tent. Draft No. 2, 1974); see Javins v. First National Realty Corp., supra. Recently, in Interstate Restaurants, Inc. v. Halsa Corp., D.C.App., 309 A.2d 108 (1973), the District of Columbia Court of Appeals refused to apply the rationale of Javins to a commercial lease. We agree; in a commercial lease negotiated between parties of equal bargaining power, each with knowledge and experience of the requirements of the industry, there is no reason to modify the common law rule.

■ Treating the machinery as personal property does not offer Manhattan any comfort since it has not presented any evidence from which this court could imply a warranty of fitness for the duration of the lease. The purpose of implied warranties in leases of personal property is to protect the bailee who has relied on the expertise and judgment of the bailor. See Javins v. First National Realty Corp., supra, 428 F.2d at 1075–1076; Farnsworth, Implied Warranties of Quality in Non-Sales Cases, 57 Col.L.Rev. 653, 655 (1957). Thus, such a warranty will not be implied in every situation. The decision can only be made after assessing a host of factors, such as whether the bailee inspected the property or looked to the judgment of the lessor. See Schmidt-Hitchcock Contractors v. Dunning, 38 Ariz. 360, 300 P. 183 (1931), whether the lessee or the lessor possessed the greater expertise, see W. E. Johnson Equipment Co. v. United Airlines, Inc., 238 So.2d 98, 100 (Fla.1970), whether the lessor was in the business of leasing such property or whether the transaction was a casual one, see Cintrone v. Hertz Truck Leasing & Renting Service, 45 N.J. 434, 212 A.2d 769 (1965), or whether the duty to maintain the chattel was allocated to the lessor or the lessee, see id.[4]

■ The application of these factors leads to the conclusion that no warranty arose from this transaction. Manhattan admits that it inspected the machines in 1959 and found them satisfactory.[5] Presumably, Manhattan continued to find the machinery fit since it renewed the lease after having exclusive possession of the machinery for eight years. The fact of renewal after inspection was alone sufficient to negate the inference of an implied warranty in Schmidt-Hitchcock Contractors v. Dunning, supra. When the parties entered into the agreement in 1959, Manhattan possessed substantial expertise, as it had long been established in the dry cleaning business and had already acquired another rug cleaning business. On the other hand, the Hinkel family had decided to lease the rug cleaning business precisely because they believed that they did not

---

4. The factors listed above are suggestive not exhaustive. "Whether the warranty of fitness applies to a particular transaction depends upon an evaluation of the total commercial setting of the transaction, including but not limited to consideration of the factors mentioned herein." W. E. Johnson Equipment Co. v. United Airlines, Inc., 238 So.2d 98, 100 (Fla.1970).

5. Defendant's Memorandum of Points and Authorities at 3.

have the expertise to operate it. Lastly, Manhattan could not have relied on Hinkel's expertise to keep the machinery in good order, since Manhattan had agreed that it would perform such maintenance. In short, Manhattan has not presented any evidence that would raise a genuine issue of fact as to the existence of an implied warranty of fitness for intended use.

Finding that there are no genuine issues of material fact and that Hinkel was entitled to judgment as a matter of law on the issue of liability, the judgment of the district court is affirmed. This case is hereby remanded to the district court for entry of an order vacating the injunction as moot. *See* United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950).

So ordered.