529 F.2d 342
 174 U.S.App.D.C. 100
 APPALACHIAN POWER COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Cities of Danville et al., Virginia, et al., Intervenors.
KENTUCKY UTILITIES COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Electric and Water Plant Board of the City of Frankfort, et
al., Intervenors.
 Nos. 73--1290, 73--2085.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 9, 1974.
Decided Jan. 8, 1976.
 
 Peter J. Schlesinger, New York City, for petitioner in No. 73--1290.
 Jerome C. Muys, Washington, D.C., with whom Thomas M. Debevoise, Washington, D.C., was on the brief, for petitioner in No. 73--2085.
 Thomas M. Walsh and A. Lee Wallace, Attys., Federal Power Commission, with whom Leo E. Forquer, General Counsel, and George W. McHenry, Sol., Federal Power Commission, were on the brief, for respondent.
 Northcutt Ely, Washington, D.C., with whom Frederick H. Ritts, Washington, D.C., was on the brief, for intervenors Cities and Virginia Polytechnic Institute and State University in No. 73--1290.
 Sandra J. Strebel, Washington, D.C., for intervenors Electric and Water Plant Board of the City of Frankfort, and others in No. 73--2085.
 Before LUMBARD,* Senior Circuit Judge for the Second Circuit, and TAMM and ROBINSON, Circuit Judges.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 In these consolidated cases, petitioners Appalachian Power Company (AP) and Kentucky Utilities Company (KU), public electric utilities regulated under the Federal Power Act,[1] seek review of orders of the Federal Power Commission rejecting increased rates proposed for electric power to be supplied certain customers pursuant to preexisting contracts. Petitioners contend that the Commission erroneously construed the contracts as fixed-rate agreements, as such protected by the Act against unilateral change. We sustain the Commission's interpretations and affirm the orders under review.
 
 I. THE APPLICABLE PRINCIPLES
 
 2
 At the outset, we pause briefly to consider three decisions of the Supreme Court staking out the principles governing resolution of issues of the kind presented here. The first, United Gas Pipe Line Company v. Mobile Gas Service Corporation,[2] involved a federally regulated natural gas pipeline bound by a ten-year contract to supply a distributor at a particular rate. During the term of the agreement the pipeline filed with the Commission a new rate schedule lacking the concurrence of its customer and purporting to fix the rate above that called for by the contract. The Court noted that the Natural Gas Act[3]--the relevant provisions of which 'are in all material respects substantially identical to the equivalent provisions of the' Federal Power Act[4]--'expressly recognizes that rates to particular customers may be set by individual contracts'[5] and 'evidence no purpose to abrogate private rate contracts as such.'[6] After analyzing the statutory text,[7] the Court concluded 'that theNatural Gas Act gives a natural gas company no power to change its contracts unilaterally,'[8] and accordingly held 'that the new schedule filed by (the pipeline) was a nullity insofar as it purported to change the rate set by its contract with (the distributor) and that the contract rate remained the only lawful rate.'[9]
 
 
 3
 The second case, Federal Power Commission v. Sierra Pacific Power Company,[10] decided the same day, presented a cognate issue under the parallel provisions of the Federal Power Act.[11] The question was whether the Commission could raise the rate established by a supply contract between a regulated electric utility and a distributor on a finding that the new rate was not unreasonably high. The Court, extending Mobile's Gas Act interpretation to the Power Act's counterparts[12] held that 'neither (the utility's) filing of the new rate nor the Commission's finding that the new rate was not unlawful was effective to change (the utility's) contract with' the distributor.[13]
 
 
 4
 The third case, decided two years later, fell outside the scope of the Mobile-Sierra doctrine. In United Gas Pipe Line Company v. Memphis Light, Gas & Water Division,[14] service contracts between a gas pipeline and a distributor-customer provided that
 
 
 5
 (a)ll gas delivered hereunder shall be paid for by Buyer under Seller's Rate Schedule . . ., or any effective superseding rate schedules, on file with the Federal Power Commission.
 
 
 6
 This agreement in all respects shall be subject to the applicable provisions of such rate schedules and to the General Terms and Conditions attached thereto and filed with the Federal Power Commission which are by reference made a part hereof.[15]
 
 
 7
 The Court held that this provision did not set 'a single fixed rate, as in Mobile, but . . . what in effect amounted to its current 'going' rate,'[16] and that '(c)ontractually this left (the pipeline) free to change its rates from time to time, subject, of course, to the procedures and limitations of the Natural Gas Act.'[17] As the Court explained, '(t)he important and indeed decisive difference between this case and Mobile[18] is that in Mobile one party to a contract was asserting that the Natural Gas Act somehow gave it the right unilaterally to abrogate its contractual undertaking, whereas here (the pipeline) seeks simply to assert, in accordance with the procedures specified by the Act, rights expressly reserved to it by contract.'[19] Consequently, the pipeline's unilateral rate elevation was fully compatible with the parties' contract and therefore valid.[20]
 
 
 8
 As this court fairly recently observed,
 
 
 9
 (t)he rule of Sierra, Mobile and Memphis is refreshingly simple: The contract between the parties governs the legality of the filing. Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid.[21]
 
 
 10
 In the past we have had occasion, in investigating the congruence of contract provisions and unilateral rate increases, to apply the Mobile-Sierra-Memphis principles thus summarized.[22] Today, in the cases at bar, we must do so once again.
 
 II. APPALACHIAN POWER COMPANY'S PETITION
 
 11
 AP filed with the Commission unilateral increases in its rates for electric power to be sold to its wholesale customers. Intervenors[23] customers in Virginia, moved to reject the filing on the ground that the proposed increases violated their allegedly fixed-rate contracts with AP and thus clashed with the Mobile-Sierra doctrine. In response, AP averred that the parties had assumed that Virginia law applied to the service agreements and that, construed accordingly, they were beyond the ambit of Mobile-Sierra. The Commission, unimpressed by that argument, granted the motions.[24]
 
 
 12
 As the Commission found, each of the contracts in question stipulates that the '(c)ustomer agrees to pay the Company monthly for electric energy delivered' thereunder at an expressly designated rate.[25] The Commission, finding no language reflecting an intent to permit unilateral changes,[26] deemed Virginia law inapposite.[27] On rehearing, the Commission adhered to that position,[28] and to its conclusion that the agreements established fixed-rates protected by Mobile-Sierra against unilateral increases.[29]
 
 
 13
 The sole claim of error advanced here is the Commission's refusal to consider Virginia law in deciding whether the contracts fell within Mobile-Sierra or instead within Memphis. AP told the Commission that the parties had taken for granted the applicability of Virginia law to their agreements, and that under the law of that state 'fixed and unalterable rate contracts were prohibited and upon the exercise of regulatory authority, (AP) has the unquestioned right and power to file changes in its contract rates.'[30] On that basis, AP urged the Commission to read the contracts as going-rate compacts,[31] and now contends that our decision in Richmond Power & Light v. Federal Power Commission[32] requires that result.[33]
 
 
 14
 We hold that the Commission properly treated Virginia law as irrelevant to interpretation of the contracts in suit.[34] To be sure, the parties are free to forge a going-rate agreement by a reference to state-law principles which impart that effect.[35] But it is well settled that '(i)n the absence of ambiguity the intent of the parties to a contract must be ascertained from the language thereof without resort to parol evidence or extrinsic circumstances.'[36] Here the service agreements unequivocably specify the rates chargeable,[37] and all that remains is 'the question whether (they) reserved to (AP) the power to make rate changes' without customer concurrence.[38] The Commission could find nothing in the contracts explicitly conferring that authority or indicating that such authority was contemplated.[39] Our attention has not been directed to any language susceptible to the construction that the rate may be altered while the contracts subsist. In these circumstances, the parties' rights and liabilities viz-a-viz the designated rate must be determined from the contracts as written,[40] and the Mobile-Sierra proscription comes into full play.[40]
 
 
 15
 Our decision in Richmond Power & Light does not support the thesis that state law may confer contractual permission to revise unequivocal rate-fixing provisions. There the agreements under scrutiny expressly adopted the rate set in a tariff on file with a state regulatory agency.[42] That internal reference drew state law into the process of ascertaining whether unilateral rate raises were envisioned.[43] In the instant case, however, the contracts contain no hint whatever that state law is to affect the price that AP can exact.[44] Rather, AP would reach outside the unambiguous contracts for an argument seeking to impart uncertainty, and then again utilize the extrinsic material to resolve the so-called doubt.[45] Well settled principles preclude both the Commission and this court from endorsing that technique.[46]
 
 III. KENTUCKY UTILITIES COMPANY'S PETITION
 
 16
 KU filed an increased rate which it proposed to charge for power supplied intervenors, eleven all-requirements municipal wholesale customers in Kentucky.[47] Intervenors urged the Commission to reject the filing as discordant with their contracts with KU, and consequently at odds with Mobile-Sierra. The Commission agreed.[48] KU sought rehearing, claiming that Richmond Power & Light mandated a determination of the parties' contractual intent in accordance with Kentucky law. The Commission distinguished Richmond Power & Light and spurned KU's argument.[49]
 
 
 17
 The Commission found that intervenors' current contracts with KU uniformly provide that
 
 
 18
 (e)ach month the Customer will pay to the Company at its office, within 10 days of rendition of bills, for all energy delivered to customer during the preceding month or bi-month determined in accordance with Rate Schedule WPS--3R,[50] which is made part of this contract.[51]
 
 
 19
 The Commission concluded upon '(a) review of the contracts between (KU) and the municipal all-requirements customers(,) . . . that they are in fact fixed-rate contracts without any provision for unilateral changes in the specified rates during the term of the contracts.'[52] In this court, KU contends that the Commission should have looked to state law, that the parties' antecedent conduct demonstrates that they contemplated going-rate agreements, and that KU was entitled to an evidentiary hearing on the issue of its contractual authority to change rates unilaterally. We disagree with KU on all counts.
 
 
 20
 KU points out that the agreements now in force had their genesis in earlier contracts made prior to the Commission's assertion of federal regulatory jurisdiction over KU's wholesale transactions.[53] Since those agreements were fashioned during the era of state regulation, KU theorizes that they should be construed conformably to the law of Kentucky, the regulating state, which assertedly allowed unilateral rate increases.[54] KU says further that during that period Kentucky authorities permitted KU to make rate changes unilaterally and that its wholesale customers did not object. These considerations, KU argues, demonstrate that the parties anticipated unilateral elevations in the rates set by the current contracts, or at least developed an issue as to contractual intent necessitating an evidentiary hearing.
 
 
 21
 We think the Commission rightly held that state law had no proper role in the process of interpreting the contracts.[55] Each agreement in force when KU filed for the rate increases in issue was executed after the Commission assumed jurisdiction over the sales in question, or after it became evident that the Commission was endeavoring to do so.[56] In each instance the agreement unambiguously designates a fixed rate.[57] There is no reservation of a right to alter the contract unilaterally, nor any reference to rate changes or to procedures for such changes.[58] By the same token, there is no basis upon which Kentucky law might be applied to contradict the unmistakable terms of the contracts in regard to rates.[59] It is equally clear that intervenors' alleged acquiescence in unilateral rate revisions before the current agreements were formulated encounters the same legal obstacles.[60]
 
 
 22
 We detect no inconsistency between these conclusions and our holding in Richmond Power & Light. As the Commission stated:
 
 
 23
 (T)he Richmond case involved a contract which was entered into when it was contemplated that the Federal Power Commission might attain jurisdiction over the agreement. The court in Richmond stated that Indiana law must apply in executing the agreement because the parties specifically stated that the energy charge would be 'at the rate and under the provisions of Company's (I & M) Tariff I.P. as regularly filed with the Public Service Commission of Indiana. . . .' There is no such language in the present agreement between KU and the municipal customers. . . .
 
 
 24
 None of the municipal contracts refer to the rate on file with the Kentucky Commission. The parties specifically state that the rates are to be determined with reference to either Rate Schedules WPS--5 or WPS--3R.[61] There is no indication of intent that the Kentucky law should apply and therefore the Richmond case is not controlling.
 
 
 25
 Likewise, Anderson Power and Light of the City of Anderson, Indiana v. FPC,[62] . . . is not controlling. In Anderson, the court made reference to contracts that were on file only with the state commission, whereas in this case the relevant contracts are on file with this Commission. Moreover, in Anderson, the court ruled that since the contract was entered into in 1957, the parties intended that Indiana law should apply and therefore an unilateral filing would not be allowed. The present contracts were entered into in 1963, 1965, 1969 or 1970. . . . KU began filing on September 7, 1962, at the Commission's request. While the Commission's attempt to assert jurisdiction over the agreements was not finally affirmed until 1965, KU and the parties must have assumed the Commission might have jurisdiction since they filed the agreements with the Commission and with the Kentucky Commission. Therefore, Anderson is not controlling and the instant agreements are subject to the Commission's Rules and Regulations under the Federal Power Act.[63]
 
 
 26
 We perceive no need to elaborate on that explanation.
 
 
 27
 For similar reasons, we sustain the Commission's ultimate ruling that the stated contract rate was applicable to KU's sales irrespective of the volume of the purchases.[64] As elucidated by the Commission,
 
 
 28
 (e)ach contract in question contains the following clause:
 
 
 29
 'The Customer may from time to time cause to be increased the amount of energy to be delivered stating the amount of additional energy desired, such request to be made at least 90 days prior to the time such additional energy is required by the Customer.' This language clearly shows that the Company has agreed to furnish to its customers, upon reasonable notice, their total electric service requirement without having to amend the contracts. Therefore, the amounts we consider to be in excess of the contract demand (and therefore outside the parameters of the fixed rate contract)[65] were in fact covered by the provisions of the contract. Such a construction is compelled by the above-quoted language which clearly contemplates increases in contract demand.[66]
 
 
 30
 We have no cause to quarrel with that course of reasoning.[67]
 
 
 31
 Lastly, we find wanting KU's complaint that the Commission erred in not affording an evidentiary hearing at which the circumstances surrounding execution of the contracts might have been explored. The obvious answer is that KU presented no material factual issue for investigation at such a hearing.[68] Construction of unambiguous features of a written contract is a legal problem;[69] 'the legal effect of reasonably clear terms of a contract,' we have said, 'is a question of law. . . .'[70] We have also compared a motion to reject a rate-increase filing with 'a motion to dismiss on the face of the pleading,'[71] and we have recognized the Commission's authority to turn down a filing that is 'patently a nullity as a matter of substantive law.'[72] As the Commission held, KU's filing plainly was in that category.
 
 The orders under review are
 
 32
 Affirmed.
 
 
 33
 LUMBARD, Circuit Judge (concurring):*
 
 
 34
 I concur in affirming the orders and add this brief summary of the reasons therefor.
 
 
 35
 There is no dispute, as indeed there could not be, that the doctrine first enunciated in Sierra Pacific and Mobile precludes a public utility, such as appellants herein, from unilaterally increasing its rates in abrogation of the terms of a fixed rate contract. Rather, it is in recognition of this principle that Appalachian argues that we should disregard the explicit language in its wholesale agreements establishing a fixed rate for the purchase of electric power and instead accept its contention that the true but unexpressed intention of it and its customers was to adopt a 'going rate' agreement, see United Gas Pipe Line Company v. Memphis Light, Gas & Water Division, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958), in conformity with Virginia's alleged proscription of 'fixed and unalterable rate contracts.'[1] The court correctly declines this invitation to step outside the four corners of an unambiguous contract. The parol evidence rule, as consistently applied in both the Virginia state courts[2] and this Circuit,[3] forbids such an excursion.
 
 
 36
 Kentucky Utilities' (KU) petition for review presents a more troublesome question. In assessing the impact of the Natural Gas Act upon pre-existing contract rights, the Supreme Court in Mobile concluded that 'the rate-making powers of natural gas companies (are) to be no different from those they would possess in the absence of the Act,'[4] 350 U.S. at 343, 76 S.Ct. at 380. KU would read this passage as endorsing its proposed unilateral rate increase since, it maintains, under Kentucky law, to which it was subject prior to the assertion of federal regulatory jurisdiction, it was allowed to and did institute unilateral rate changes. Although reasonable at first blush, KU's argument does not withstand closer inspection.[5]
 
 
 37
 The above quoted passage from the Mobile opinion must be read in the context of the Supreme Court's assumption that '(a)bsent the Act, a unilateral announcement of a change to a contract would of course be a nullity,' 350 U.S. at 339, 76 S.Ct. at 378. Assuming, arguendo, that such is not the case under Kentucky law, I do not believe that there is any warrant in either Sierra Pacific-Mobile or elsewhere, for requiring the F.P.C. to defer to state law when such a deferral would impair the Congressional purpose of insuring 'the stability of supply arrangements which all agree is essential to the health of the natural gas (and power) industries,' Mobile, 350 U.S. at 344, 76 S.Ct. at 380. Cf. Jerome v. United States, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1945).
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970)
 
 
 [1]
 Act of June 10, 1920, ch. 285, 41 Stat. 1063, Act of Aug. 26, 1935, ch. 687, tit. II, 49 Stat. 838, as amended, 16 U.S.C. §§ 791a et seq
 
 
 [2]
 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956)
 
 
 [3]
 Act of June 21, 1938, ch. 556, 52 Stat. 821, as amended, 15 U.S.C. §§ 717 et seq. (1970)
 
 
 [4]
 FPC v. Sierra Pac. Power Co., 350 U.S. 348, 353, 76 S.Ct. 368, 371, 100 L.Ed. 388, 394 (1956)
 
 
 [5]
 United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra note 2, 350 U.S. at 338, 76 S.Ct. at 378, 100 L.Ed. at 383. See also Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), 390 U.S. 747, 822, 88 S.Ct. 1344, 1388--1389, 20 L.Ed.2d 312, 367 (1968); Borough of Lansdale v. FPC, 161 U.S.App.D.C. 185, 194, 494 F.2d 1104, 1113 (1974)
 
 
 [6]
 United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra note 2, 350 U.S. at 338, 76 S.Ct. at 377--378, 100 L.Ed. at 383
 
 
 [7]
 Id. at 338--345, 76 S.Ct. at 377--382, 100 L.Ed. at 383--387
 
 
 [8]
 Id. at 347, 76 S.Ct. at 382, 100 L.Ed. at 388
 
 
 [9]
 Id. See also Tyler Gas Serv. Co. v. FPC, 101 U.S.App.D.C. 184, 188, 247 F.2d 590, 594, cert. denied, 355 U.S. 895, 78 S.Ct. 263, 2 L.Ed.2d 193 (1957)
 
 
 [10]
 Supra note 4
 
 
 [11]
 See text supra at note 4. Public electric utilities are required to file with the Commission all rates, and all contracts affecting rates, pertaining to sales within the Commission's jurisdiction. Federal Power Act § 205(c), 16 U.S.C. § 824d(c) (1970). Changes in previously filed rates must be submitted at least 30 days before they are slated to go into effect, id. § 205(d), 16 U.S.C. § 824d(d) (1970), and the Commission may suspend operation of the new rate for a maximum five-month period pending an investigation as to its reasonableness. Id. § 205(e), 16 U.S.C. § 824d(e) (1970). The Commission may also modify any rate upon a determination that it is 'unjust, unreasonable, unduly discriminatory or preferential . . ..' Id. § 206(a), 16 U.S.C. § 824e(a) (1970)
 
 
 [12]
 FPC v. Sierra Pac. Power Co., supra note 4, 350 U.S. at 353, 76 S.Ct. at 371, 100 L.Ed. at 394
 
 
 [13]
 While not a decisional consideration in the cases at bar, we call attention to the fact that the Mobile-Sierra interpretation 'in no way impairs the regulatory powers of the Commission,' United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra note 2, 350 U.S. at 344, 76 S.Ct. at 381, 100 L.Ed. at 386; see also FPC v. Sierra Pac. Power Co., supra note 4, 350 U.S. at 353--355, 76 S.Ct. at 371--372, 100 L.Ed. at 394, because the Commission can revise any rate when 'necessary in the public interest.' Federal Power Act § 201(a), 16 U.S.C. § 824(a) (1970). See also FPC v. Sierra Pac. Power Co., supra note 4, 350 U.S. at 355, 76 S.Ct. at 371, 100 L.Ed. at 395. And see also FPC v. Louisiana Power & Light Co., 406 U.S. 621, 646, 92 S.Ct. 1827, 1841, 32 L.Ed.2d 369, 388 (1972); Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 5, 390 U.S. at 820--821, 88 S.Ct. at 1388, 20 L.Ed.2d at 366. Thus, even though the proceeding eventuating in the Sierra decision was initiated by a unilateral rate-raise filing invoking § 205 of the Federal Power Act, 16 U.S.C. § 824d (1970), the Court remanded the case for an inquiry under § 206, 16 U.S.C. § 824e (1970); see Borough of Lansdale v. FPC, supra note 5, 161 U.S.App.D.C. at 198, 494 F.2d at 1117, to determine whether the contract rate was 'so low as to have an adverse effect on the public interest.' FPC v. Sierra Pac. Power Co., supra note 4, 350 U.S. at 355, 76 S.Ct. at 372, 100 L.Ed. at 395. See also FPC v. Texaco, Inc., 417 U.S. 380, 391 n. 4, 94 S.Ct. 2315, 2337 n. 4, 41 L.Ed.2d 141, 153 n. 4 (1974). The Commission has authority to change agreed rates, however, only 'in circumstances of unequivocal public necessity,' Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 5, 390 U.S. at 822, 88 S.Ct. at 1388--1389, 20 L.Ed.2d at 367; see also FPC v. Sierra Pac. Power Co., supra note 4, 350 U.S. at 353--355, 76 S.Ct. at 371--373, 100 L.Ed. at 394--395; United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra note 2, 350 U.S. at 344--347, 76 S.Ct. at 381--382, 100 L.Ed. at 386--388, and '(t)he conditions precedent to the Commission's exercise of its power under § 206(a) is a finding that the existing rate is 'unjust, unreasonable, unduly discriminatory or preferential." FPC v. Sierra Pac. Power Co., supra note 4, 350 U.S. at 353, 76 S.Ct. at 372, 100 L.Ed. at 394
 
 
 [14]
 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958)
 
 
 [15]
 Id. at 105, 79 S.Ct. at 196, 3 L.Ed.2d at 156 (emphasis by the Court)
 
 
 [16]
 Id. at 110, 79 S.Ct. at 198, 3 L.Ed.2d at 159
 
 
 [17]
 Id
 
 
 [18]
 And, of course, Sierra as well
 
 
 [19]
 United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., supra note 14, 358 U.S. at 112, 79 S.Ct. at 199, 3 L.Ed.2d at 160
 
 
 [20]
 Id. at 112--133, 79 S.Ct. at 199--200, 3 L.Ed.2d at 160--161. See also Wisconsin v. FPC, 373 U.S. 294, 304, 83 S.Ct. 1266, 1272, 10 L.Ed.2d 357, 365 (1963); Sunray Mid-Continent Oil Co. v. FPC, 364 U.S. 137, 154--155, 80 S.Ct. 1392, 1402, 4 L.Ed.2d 1623, 1635 (1960)
 
 
 [21]
 Richmond Power & Light v. FPC, 156 U.S.App.D.C. 315, 318, 481 F.2d 490, 493, cert. denied, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973)
 
 
 [22]
 See Gulf States Utils. Co. v. FPC, 171 U.S.App.D.C. 57, 518 F.2d 450 (1975); Sam Rayburn Dam Elec. Cooperative v. FPC, 169 U.S.App.D.C. 281, 515 F.2d 998 (1975); Richmond Power & Light v. FPC, supra note 21; Public Serv. Comm'n v. FPC, No. 24,716 (D.C. Cir. Mar. 25, 1974), at 57--62, 66--76, cert. denied, --- U.S. ---, 96 S.Ct. 1106, 47 L.Ed.2d 314, 44 U.S.L.W. 3467 (1976); Borough of Lansdale v. FPC, supra note 5; Tyler Gas Serv. Co. v. FPC, supra note 9, 101 U.S.App.D.C. at 187--188, 247 F.2d at 593--594; Portsmouth Gas Co. v. FPC, 101 U.S.App.D.C. 99, 102--103, 247 F.2d 90, 93--94 (1957); Cincinnati Gas & Elec. Co. v. FPC, 101 U.S.App.D.C. 1, 6, 246 F.2d 688, 693 (1957)
 
 
 [23]
 The Cities of Bedford, Danville, Martinsville, Radford, Richlands and Salem, Virginia, and the Virginia Polytechnic Institute and State University
 
 
 [24]
 Appalachian Power Co., 48 F.P.C. 1366 (1972) (original order), 49 F.P.C. 387 (1973) (order on rehearing)
 
 
 [25]
 Appalachian Power Co., 48 F.P.C. 1366 F.P.C. at 1367 (orginal order). Each contract, immediately following this provision, specified unqualifiedly the particular rate to be charged. Id
 
 
 [26]
 On this score the Commission said:
 (T)here is no language in the contracts allowing unilateral rate increases. Furthermore, there is no language giving any indication that the parties even contemplated that these contracts permitted unilateral increases in rates.
 
 
 [27]
 Id. The Commission did, however, institute a § 206(a) investigation. Id. at 1368. See note 11 supra. That proceeding was recently dismissed. Appalachian Power Co., F.P.C. (June 9, 1975)
 
 
 [28]
 Appalachian Power Co., supra note 24, 49 F.P.C. at 388 (order on rehearing)
 
 
 [29]
 Id. The original order was amended, however, to enable AP's filing as to monthly deliveries in excess of the quantity of power which the City of Martinsville was entitled to receive under its contract. Id. That modification is not in issue here
 
 
 [30]
 Appalachian Power Co., supra note 24, 48 F.P.C. at 1367 (original order). In support of that proposition, AP relied on Town of Victoria v. Victoria Ice, Light & Power Co., 134 Va. 134, 114 S.E. 92 (1922); Commonwealth ex rel. Page Milling Co. v. Shenandoah River Light & Power Corp., 135 Va. 47, 115 S.E. 695 (1925)
 
 
 [31]
 Appalachian Power Co., supra note 24, 48 F.P.C. at 1367 (original order)
 
 
 [32]
 Supra note 21
 
 
 [33]
 AP also argues that the Commission departed from its earlier ruling in Philadelphia Elec. Co., 49 F.P.C. 10 (1973), modified and vacated in part sub nom. Borough of Lansdale v. FPC, supra note 5, wherein the Commission announced its 'intent to strictly construe . . . existing (fixed-rate) contracts so as to permit no enlargement of rights or obligations thereunder absent a clear showing of necessity to meet the public interest.' Id. at 12. On rehearing of the proceeding under review, the Commission pointed out that, with a single exception not pertinent here, intervenors 'do not seek to enlarge any right contained in the contracts but rather allege that (AP) is unilaterally filing rates in apparent violation of the fixed rate provisions of their respective contracts.' Appalachian Power Co., supra note 24, 49 F.P.C. at 388 (order on rehearing). We deem that a sufficient answer to AP's contention and, indeed, the only answer that would pass muster under Mobile-Sierra
 
 
 [34]
 Even if Virginia law were applicable, it is not at all clear that AP would be helped. AP does not claim that Virginia law inexorably permits unilateral rate increases, or that it confers upon public utilities the unconditional right to abrogate contractual obligations. The prohibition on 'fixed and unalterable rate contracts' may mean simply that all contracts are subject to revision 'in the public interest,' Commonwealth ex rel. Page Milling Co. v. Shenandoah River Light & Power Corp., supra note 30, 115 S.E. at 702, a position thoroughly harmonious with federal law. See note 13 supra. We make no attempt to resolve the question, however, for in this case we affirm the Commission irrespective of the Virginia law
 
 
 [35]
 See Richmond Power & Light v. FPC, supra note 21, 156 U.S.App.D.C. at 319--326, 481 F.2d at 494--501. We hasten to add that, in instances of that kind, state law assumes a role only because the parties agree that it shall. Put another way, state law is relevant only to the extent intended by the parties. As the Commission held, Appalachian Power Company, supra note 24, 49 F.P.C. at 388 (order on rehearing), neither state law nor conflict-of-laws principles summoning state law operate of their own force upon contracts subject to the Commission's regulatory jurisdiction. See Duke Power Co. v. FPC, 130 U.S.App.D.C. 389, 393--397, 401 F.2d 930, 934--938 (1968)
 
 
 [36]
 Simpson Bros. v. District of Columbia, 85 U.S.App.D.C. 275, 279, 179 F.2d 430, 434 (1949), cert. denied, 338 U.S. 911, 70 S.Ct. 350, 94 L.Ed. 561 (1950). See also Clayman v. Goodman Properties, Inc., 171 U.S.App.D.C. 88, 96, 518 F.2d 1026, 1034 (1973); E. P. Hinkel & Co. v. Manhattan Co., 165 U.S.App.D.C. 140, 143, 506 F.2d 201, 204 (1974); Borough of Lansdale v. FPC, supra note 5, 161 U.S.App.D.C. at 189, 494 F.2d at 1108; News Union v. NLRB, 129 U.S.App.D.C. 272, 277, 393 F.2d 673, 678 (1968); Vakas v. Manuel, 114 U.S.App.D.C. 368, 369, 316 F.2d 369, 370 (1963); H. Herfurth, Jr., Inc. v. United States, 66 App.D.C. 220, 225, 85 F.2d 719, 724 (1936); Downs v. Bankhead, 44 App.D.C. 101, 105 (1915); Tyssowski v. F. H. Smith Co., 35 App.D.C. 403, 407 (1910)
 
 
 [37]
 See note 25 supra and accompanying text. In this crucial respect the instant case differs from Sam Rayburn Dam Elec. Cooperative v. FPC, supra note 22. There we referred to extrinsic material 'because of the arguably ambiguous nature of the contract provisions.' 169 U.S.App.D.C. at 286, 515 F.2d at 1003
 
 
 [38]
 United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., supra note 14, 358 U.S. at 114, 79 S.Ct. at 200, 3 L.Ed.2d at 161. See also Gulf States Utils. Co. v. FPC, supra note 22, 171 U.S.App.D.C. at 61--62, 518 F.2d at 454--455
 
 
 [39]
 See note 26 supra
 
 
 [40]
 Compare Gulf States Utils. Co. v. FPC, supra note 22, 171 U.S.App.D.C. at 61--62, 518 F.2d at 454--455; Sam Rayburn Dam Elec. Co-operative v. FPC, supra note 22, 169 U.S.App.D.C. at 285--286, 515 F.2d at 1002--1003. See also Part I supra
 
 
 [41]
 See Part I supra
 
 
 [42]
 156 U.S.App.D.C. at 319, 323--324, 481 F.2d at 494, 498--499
 
 
 [43]
 Id. at 319--326, 481 F.2d at 494--501
 
 
 [44]
 See note 26 supra
 
 
 [45]
 See text supra at notes 30--33
 
 
 [46]
 See cases cited supra note 36
 
 
 [47]
 The intervenors are the Cities of Bardstown, Falmouth, Madisonville and Nicholasville, the Electric & Water Plant Board of Frankfort, the City Utilities Commission of Barbourville, Bardwell City Utilities, the Electric Plant Board of Benham, the City Utilities Commission of Corbin, and the Municipal Light and Water Plant of Providence; and Berea College, serving the City of Berea at retail. The filing also covered service provided to the City of Paris, a partial-requirements customer, and Old Dominion Power Company, KU's wholly-owned subsidiary, applications not involved in the present review
 
 
 [48]
 Kentucky Utils. Co., 49 F.P.C. 1470 (1973) (original order)
 
 
 [49]
 Kentucky Utils. Co., 50 F.P.C. 537 (1973) (first rehearing order). In this order the Commission also instituted a § 206(a) investigation. Id. at 538--539. See note 11 supra. The Commission agreed with an alternative argument by Kentucky--that application of the fixed-rate provision should be limited to the maximum commitment specified in the agreements--and accordingly accepted the filing to the extent that it pertained to any excess deliveries. Id. Intervenors challenged this ruling on the ground of inconsistency with their contracts. The Commission ultimately took this position and rejected the filing in its entirety as to intervenors. Kentucky Utils. Co., 50 F.P.C. 1120 (1973) (second rehearing order). See text infra at notes 64--66
 
 
 [50]
 Until 1962, KU was regulated exclusively by the Public Service Commission of Kentucky. In that year, KU filed its wholesale contracts with the Federal Power Commission at the latter's request. The contracts then called for a lower optimal rate, designated 'WPS--5,' which the Kentucky agency had approved for nine of KU's wholesale customers upon execution of new service agreements. The WPS--5 rate, offered only on a five-year initial term basis, displaced an earlier WPS--2 rate available on an annual basis. In 1965, KU filed with both regulatory bodies a new and lower rate, WPS--3, which KU later withdrew and for it substituted rate WPS--3R. KU's current effective contracts with intervenors--those which it desires to unilaterally revise upward--were entered into during the period 1963--1972, and thus specify either the WPS--5 or the WPS--3R rate
 
 
 [51]
 Kentucky Utils. Co., supra note 49, 50 F.P.C. at 537--538 (first rehearing order)
 
 
 [52]
 Kentucky Utils. Co., supra note 48, 49 F.P.C. at 1471 (original order). On rehearing the Commission reiterated this view. Kentucky Utils. Co., supra note 49, 50 F.P.C. at 537 (first rehearing order)
 
 
 [53]
 See note 50 supra. KU informs us that service to its municipal customers was inaugurated in the 1940's
 
 
 [54]
 Since we find this contention unacceptable, we do not reach the question whether Kentucky law sustains KU's theory
 
 
 [55]
 It is urged that the Commission itself relied on a variety of extrinsic evidence, and therefore should not ignore state law and other evidence outside the contracts. The Commission did have occasion to discuss the parties' conduct, Kentucky Utils. Co., supra note 49, 50 F.P.C. at 538 (first rehearing order), but only in response to KU's arguments in its petition for rehearing. The original decision left unaltered was based solely on the contract language. See text supra at notes 50--52
 
 
 [56]
 See note 50 supra
 
 
 [57]
 See text supra at note 51
 
 
 [58]
 KU does not point to any contract language having these effects
 
 
 [59]
 See text supra at notes 35--41. Throughout these proceedings, the Commission has consistently relied on the plain language of the agreements. The Commission declined to take the parties' conduct into account in resolving the excess-demand issue, see text infra at notes 64--65, because 'only (KU's) contracts, as filed with the Commission, along with any properly filed and accepted amendments, can be regarded as embodying the presently effective contractual rates, terms and conditions.' Kentucky Utils. Co., supra note 49, 50 F.P.C. at 1120 (order on second rehearing)
 
 
 [60]
 The conduct upon which KU relies occurred prior to execution of any of the current contracts. We have admonished 'that '(w)hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." Clayman v. Goodman Properties, Inc., supra note 36, 171 U.S.App.D.C. at 95, 518 F.2d at 1033, quoting Murray v. Lichtman, 119 U.S.App.D.C. 250, 252, 339 F.2d 749, 751 (1964), in turn quoting 3 Corbin, Contracts § 573 (1960). See also Gibson v. United States, 106 U.S.App.D.C. 10, 12--13, 268 F.2d 586, 588--589 (1959). To be carefully distinguished is the principle that parties may modify their contractual arrangements by subsequent conduct, Sam Rayburn Dam Elec. Cooperative v. FPC, supra note 22, 169 U.S.App.D.C. at 291--292, 515 F.2d at 1008--1009. See also Gulf States Utils. Co. v. FPC, supra note 22, 17 U.S.App.D.C. at 62--66, 518 F.2d at 455--459. As already stated, the events upon which KU rests are not of the latter character
 
 
 [61]
 See note 50 supra
 
 
 [62]
 A companion case to Richmond Power & Light v. FPC, supra note 21
 
 
 [63]
 Kentucky Utils. Co., supra note 49, 50 F.P.C. at 537--538 (order on first rehearing). The Commission also advanced, as an additional basis for rejecting KU's contention, the view that the going-rate character of the contracts was evinced by KU's own conduct. Since we accept as valid the Commission's first reason, we have no occasion to consider the second
 
 
 [64]
 See note 49 supra
 
 
 [65]
 See note 49 supra
 
 
 [66]
 Kentucky Utils. Co., supra note 49, 50 F.P.C. at 1120--1121 (order on second rehearing). Compare Gulf States Utils. Co. v. FPC, supra note 22, 171 U.S.App.D.C. at 62--63, 518 F.2d at 455--456
 
 
 [67]
 '(W)here the (Commission's) decision involves the interpretation of the parties' intent as revealed in the language of a contract, it is proper to defer to the Commission's expertise if its decision is 'amply supported both factually and legally." Gulf States Utils. Co. v. FPC, supra note 22, 171 U.S.App.D.C. at 64, 518 F.2d at 457, quoting United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., supra note 14, 358 U.S. at 114, 79 S.Ct. at 201, 3 L.Ed.2d at 161. We are satisfied that the Commission's holding on this point meets that test
 
 
 [68]
 Compare Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 232, 414 F.2d 1125, 1128 (1969); Municipal Light Bds. v. FPC, 146 U.S.App.D.C. 294, 299, 450 F.2d 1341, 1346 (1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972)
 
 
 [69]
 Clayman v. Goodman Properties, Inc., supra note 36, 171 U.S.App.D.C. at 96, 518 F.2d at 1034, and cases cited in note 45 thereof
 
 
 [70]
 Id., and cases cited in note 46 thereof
 
 
 [71]
 Municipal Light Bds. v. FPC, supra note 68, 146 U.S.App.D.C. at 299, 450 F.2d at 1346
 
 
 [72]
 Id. We have pointed out that one example of such a nullity is a filing in violation of Mobile-Sierra. Id. See also Richmond Power & Light v. FPC, supra note 21, 156 U.S.App.D.C. at 317, 481 F.2d at 492; Associated Press v. FCC, 145 U.S.App.D.C. 172, 180, 448 F.2d 1095, 1103 (1971)
 
 
 *
 Sitting by designation
 
 
 [1]
 Appalachian Power Co., 48 F.P.C. 1366, 1367 (1972) (original order)
 
 
 [2]
 E.g., Globe Iron Const. Co. v. First National Bank, 205 Va. 841, 140 S.E.2d 629, 633 (1965)
 
 
 [3]
 E.g., E. P. Hinkel & Co. v. Manhattan Co., 165 U.S.App.D.C. 140, 143, 506 F.2d 201, 204 (1974)
 
 
 [4]
 As the Supreme Court recognized in Sierra Pacific: 'The provisions of the Federal Power Act relevant to this question are in all material respects substantially identical to the equivalent provisions of the Natural Gas Act,' 350 U.S. at 353, 76 S.Ct. at 371
 
 
 [5]
 KU also argues that despite the clear language in its wholesale agreements establishing a fixed rate, the intent of the parties was to permit unilateral changes as sanctioned by Kentucky law. For the reasons given above in connection with Appalachian's similar claim, this contention is unsound