**MAJESTIC BUILDERS CORPORATION, Plaintiff,**

v.

**MOUNT AIRY BAPTIST CHURCH HOUSING CORPORATION, INC., Defendant.**

Civ. A. No. 1933–71.

United States District Court, District of Columbia.

May 3, 1977.

Peter A. Greenburg, Washington, D. C., for plaintiff.

Larry C. Williams, Washington, D. C., for defendant.

## MEMORANDUM OPINION

SIRICA, District Judge.

This dispute arises out of the construction of the Tyler House, an apartment building in the Mt. Airy area of Washington, D. C., for low and moderate income families, that was built under a federal loan guarantee program. The plaintiff is Majestic Builders Corporation ("Majestic"), the general contractor for the project. The defendant is Mt. Airy Baptist Church Housing Corporation ("Mt. Airy"), the owner of the building.

The plaintiff bases its suit on breach of the construction contract and unjust enrichment. It claims it is entitled to at least an additional $271,542 under the construction contract as modified. For the reasons which follow, the Court finds that the plaintiff is entitled to that amount.

I

In 1966, a partnership called Mt. Airy Associates developed plans for constructing the Tyler House under a federal subsidy program. The three partners in the group

were Milton Polinger, Howard Polinger, and former Judge Marjorie Lawson.

It subsequently became apparent, however, that in order to obtain a 100 percent mortgage guarantee from the government, the project would have to be taken over from the start by a non-profit sponsor. For this reason, and also to minimize the group's own cash investment in the project, Mt. Airy Associates was replaced by the present defendant non-profit corporation.

The officers and directors of the sponsor corporation were all residents of the Mt. Airy area. Although none was associated with Mt. Airy Associates, the three partners were actively involved in setting up the organization and continued to be actively involved with the project:

(1) Majestic Builders, of which Milton Polinger was president and Howard Polinger an officer, was designated construction contractor for the project;

(2) the Polinger Company, of which Milton Polinger was also president, was designated the project's management agent· and

(3) Judge Lawson was designated attorney for Mt. Airy; she subsequently became attorney for Majestic in this matter as well.

On March 13, 1969, after approval from the Federal Housing Administration ("FHA"), Majestic and Mt. Airy entered into a standard Federal Housing Administration "cost plus" contract for the construction of the Tyler House. Under the contract, the plaintiff was to be paid a total of not more than $4,163,749 for completing the project. A construction mortgage covering this amount was obtained by Mt. Airy from Thomas J. Fisher and Company, Inc.; that mortgage was in turn guaranteed by the Federal Housing Administration.

Paragraph IE of the construction contract provided in part as follows:

Changes in the Drawings and Specifications or any terms of the Contract Documents, or orders for extra work, or changes by altering or adding to the work which will result ın any net construction cost increase, or will change the design concept . . . may be effected only with the prior written approval of the Lender [Thomas J. Fisher and Company, Inc.] . . . and the [Federal Housing] Commissioner and under such conditions as either the Lender or the Commissioner may establish.

Majestic began work shortly after the contract was signed, but immediately ran into difficulties with laying the foundation. It soon became apparent that the foundation called for in the contract—one consisting of half "spread footings" and half "caissons"—would be inadequate; a foundation consisting completely of caissons was needed. Majestic and Mt. Airy agreed that the change should be made. But since this change in plans and the resultant delay would increase the total cost of the project considerably, the two, in accordance with paragraph IE of the original contract, submitted on a standard FHA form a contract modification ("Change Order # 1"). Assuming that the change order would be approved, Majestic went ahead with construction of the project as modified. However, the FHA never did approve this change order.

As time went on, the owner and the contractor agreed that other changes had become necessary and therefore submitted additional change orders to the FHA. Some of these were accepted and the contract price eventually rose to $4,176,629. Finally, on March 1, 1971, as work drew toward completion, the two signed a final contract modification form, by which they agreed that the contract price would be increased to $4,700,129. This modification was designated "Change Order # 11."

Although the $4.7 million figure did not represent the full cost of the project, with profit, to Majestic, it did represent an amount which the FHA had previously indicated might be acceptable.

The change request had two basic elements:

(1) a resubmission of the first change request that was never acted upon;

(2) costs incurred because of the need to change the foundation plans, but which,

Majestic claimed, were not foreseen at the time the first change request was submitted.

On the form submitted to the FHA, and on* all other change request forms submitted, was the following condition imposed by the FHA:

When the FHA estimated cost of all accepted changes results in a . . . net . . . increase the additional costs will be defrayed by the mortgagor [Mt. Airy]. The acceptance of any change or changes involving a net increase does not increase the mortgage amount.

On the same page, the two parties signed a separate form certification to the effect that:

[t]he undersigned Mortgagor, acting pursuant to a resolution adopted at a meeting of its stockholders or members, and the undersigned Contractor, hereby agree to the above described construction changes and hereby agree that the construction contract executed by them under date of March 13, 1969 is amended by increasing the contract price of $4,176,629 . . . to $4,700,129 all other provisions of said Construction Contract to remain unchanged.

After Change Order # 11 was signed by representatives of Majestic and Mt. Airy, it was sent, in accordance with paragraph IE of the original contract, to Thomas J. Fisher and Co., Inc. There it was signed and sent on to the FHA, where, in accordance with governing rules, the Administration began to determine whether the proposed change was due to necessity or would improve the project. *FHA Project Mortgage Insurance Manual*, Volume VI, Book 2, Part B, ¶ 63521. The change order was referred first to the Architectural Section and then to the Cost Section. It was approved in both places. Presumably, then, the staff found that the portion of Change Order # 11 which was simply a resubmission of Change Order # 1 improved the subject and that the remaining increase in the contract price was due to necessity.

At this point, according to the manual, the FHA should have required that suffi-

cient funds be placed in escrow with Thomas J. Fisher & Co. to cover the increase. *Id.* But, for whatever reason, this was not done here; on April 14, 1971, the appropriate officials at the FHA simply approved the change order.

At about the same time, Majestic and Mt. Airy asked the FHA to make a commensurate increase in the portion of the mortgage guarantee attributable to construction of the apartment building. Majestic had talked to officials at the FHA numerous times previously about increasing the mortgage guarantee, but this was apparently the first time it had made a written request.

The FHA recognized the problems that Majestic had encountered, but it felt that the full increase was not justified. After a great deal of negotiation, the FHA agreed to increase the mortgage guarantee attributable to construction of the apartment by $278,818 to $4,442,567, and the mortgage was subsequently increased by that amount. Of that, Majestic eventually received $4,428,587.

In the end, then, there existed a difference between the amount Majestic was apparently entitled to under the construction contract as modified ($4,700,129) and the amount Majestic received ($4,428,587). The difference amounted to $271,542 and that is the impetus of this suit. The case was filed in 1971; a jury trial was not requested.

## II

The plaintiff originally brought this action not only against Mt. Airy, but also against the Secretary of Housing and Urban Development and the Commissioner of the FHA, both of whom exercised control over the mortgage guarantee, and also against the D. C. Redevelopment Land Agency, which allegedly sold the land to Mt. Airy in the faulty condition that made the change in the foundation necessary. However, Judge Waddy, who presided over the case previously, granted the motions of all defendants except Mt. Airy for dismissal; that action was affirmed by the Court of Appeals.

### III

Majestic's primary claim against Mt. Airy is for breach of contract. Its argument is simple. It refers to the language of Change Order # 11, which clearly indicates: . .

(1) that Mt. Airy agreed to change the original contract by increasing the contract price to $4,700,129; and

(2) that acceptance of the agreement by the FHA and Thomas J. Fisher and Company, Inc., did not increase the mortgage amount; this increase would be "defrayed by the mortgagor."

Majestic then refers to the law of this jurisdiction that, where the contract terms are unambiguous ". . . the court does not consider extrinsic evidence, but finds the intention of the parties in the language used to express their agreement." *E. P. Hinkel & Co., Inc. v. Manhattan Co.*, 165 U.S.App.D.C. 140, 506 F.2d 201, 204 (1974).

Therefore, the plaintiff concludes, the defendant is liable under the contract for the unpaid balance of $271,542.

Mt. Airy has raised a number of defenses to avoid the force of this argument. The first substantial one * is that Change Order # 11 is invalid for lack of consideration. The defendant concedes that adequate consideration existed if Majestic agreed to do something it was not legally obligated to do, or if the contractor faced unforeseen difficulties in doing the work it was obligated to do. But the defendant argues that neither principle applies here.

With regard to that portion of Change Order # 11 which was simply a resubmission of Change Order # 1, Mt. Airy does not deny that Majestic literally undertook to do something it was not legally obligated to do—namely, to build an apartment with a foundation entirely of caissons rather than only partly of caissons and partly of spread footings. But the defendant claims that Majestic knew before the original contract was signed that the plans would have to be changed· therefore, in putting forward the original contract plans, the contractor was guilty of fraud. In support of this argument, Mt. Airy relies solely on an engineering report made in June of 1967, for the Redevelopment Land Agency. This report considered a fairly large tract of land, of which the future site of the Tyler House was only a part. But as the plaintiff has amply shown, this report in no way indicated that the foundation planned for the project under the original contract would be inadequate. In fact, the engineer who completed that report subsequently agreed that the foundation originally planned would be adequate. Therefore, this Court finds that the need to change the plans was not foreseen, and that, therefore, adequate consideration existed for that portion of Change Order # 11 which was simply a resubmission of Change Order # 1.

The defendant has not alternatively argued that the remainder of the increase in Change Order # 11 reflected foreseen expenses incurred by Majestic after Change Order # 1 was entered into. Since Mt. Airy has not disputed this, and since the FHA apparently found these expenses to be necessary, the Court finds that there existed adequate consideration for this portion of Change Order # 11 as well.

The second argument that Mt. Airy makes to avoid the force of the language in Change Order # 11 relied on by Majestic is that the actual intention of the parties was, in fact, quite different. Mt. Airy claims its understanding, at least, was that it would be liable for the increase only to the extent that the mortgage amount was subsequent-

---

* The defendant some time ago sought dismissal for a reason not directly related to the merits of the case. It argued then that the Polinger Company, which was Mt. Airy's managing agent at the time, and which was also very closely allied with the plaintiff, had refused to pay Mt. Airy's attorneys' fees in the case, that this rendered the defendant incapable of carrying on an effective defense, and that, therefore, the Court should exercise its equitable power to dismiss the case. But the Polinger Company has not been Mt. Airy's managing agent for some time, and the defendant has not indicated that this problem has continued. Therefore, this argument can safely be disregarded.

**1380**

ly increased. Because the contract language appeared on a form supplied by a third party, and because the parties had not had quite the adversarial relationship normally present in contract negotiations, the Court allowed testimony on this issue.

The primary witness heard was Judge Lawson, who acted as counsel for both Majestic and Mt. Airy in these negotiations. Judge Lawson specifically testified that she was aware of the language making the non-profit sponsor liable for the entire increase when she advised Mt. Airy to sign Change Order # 11, and she accepted that fact. Mt. Airy does not deny that normally it would be bound by this statement. But it claims that in this instance Judge Lawson inadequately represented its interests in favor of those of Majestic. Therefore, Mt. Airy claims, the Court should not impute to it her knowledge and intent.

But Mt. Airy has not indicated where Judge Lawson's advice was inadequate. Her believable and unrefuted testimony, and the record as a whole, make clear the following:

(1) That Majestic was properly asking for a price increase;

(2) That failure to sign Change Order # 11 would seriously have jeopardized the project;

(3) That it was very probable that, if the FHA approved the price increase, the mortgage would be increased a commensurate amount;

(4) That before being eligible for a mortgage increase, Mt. Airy had to have agreed to be liable for the entire price increase;

(5) That, since Mt. Airy had no net assets and, because of the statutory limits on rents, no likelihood of obtaining net assets, it itself would not be substantially worse off by signing Change Order # 11; and

(6) That, in a general way, Judge Lawson communicated these considerations to Rev. Clarence Long, the president of Mt. Airy, and he agreed that Mt. Airy had no practical alternative to signing Change Order # 11.

In these circumstances, the Court concludes that Judge Lawson's advice to Mt. Airy was entirely proper.

Nevertheless, Mt. Airy has attempted to blunt Judge Lawson's testimony with that of Rev. Long that the president of Majestic, who is now dead, "had said several times that he would never move against the corporation." The Court finds this testimony believable also. But nothing more than this statement was made. Mt. Airy has failed to tie it in to the negotiations leading up to the signing of Change Order # 11, or to show that the statements constituted a waiver of Majestic's rights under the contract.

Therefore, the Court finds that the parties actually did intend what the language of Change Order # 11 indicated—that Mt. Airy would be liable for the entire amount of the increase.

IV

For the foregoing reasons, the Court concludes that judgment should be entered for the plaintiff. Majestic Builders Corporation will submit an appropriate order, noted by Mt. Airy Baptist Church Housing Corporation. This opinion will constitute the Court's Findings of Fact and Conclusions of Law.